**William N. CLARK, Appellant,**

v.

**MODERN GROUP LTD.; John F. Smith.**

No. 92–2048.

United States Court of Appeals,
Third Circuit.

Argued June 21, 1993.

Decided Nov. 18, 1993.

Sur Petition for Rehearing Dec. 22, 1993.

Stephen G. Console (argued), Mark S. Scheffer, Law Offices of Stephen G. Console, Philadelphia, PA, for appellant.

Nicholas N. Price (argued), Schnader, Harrison, Segal & Lewis, Philadelphia, PA, for appellee Modern Group Ltd.

Before STAPLETON, MANSMANN and HUTCHINSON, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

Appellant William N. Clark ("Clark") appeals an order of the United States District Court for the Eastern District of Pennsylvania granting appellee Modern Group Ltd.'s ("Modern") motion for summary judgment on Clark's claim for wrongful discharge. Clark argues that Modern terminated his at-will employment in violation of public policy. Specifically, he contends his termination resulted from his objections to Modern's refusal to report as taxable income certain auto expense reimbursements to its executives on their 1990 W–2 withholding statements. For purposes of summary judgment, we must assume that Clark's objections to Modern's refusal to report the auto expense it paid its executives was the cause of his discharge. Pennsylvania law will determine whether Clark's discharge was wrongful, but federal law determines whether Modern and its executives violated the Internal Revenue Code.

In Pennsylvania, an employer may terminate an at-will employee with or without justification unless the reason for the discharge offends a clear mandate of public policy. Clark asks us to hold that Pennsylvania's public policy exception to the at-will doctrine extends to cases in which an employee "reasonably believes" that his employer has requested him to perform an unlawful act and is discharged for objecting to the proposal he believes is unlawful.[1] We predict that the Pennsylvania Supreme Court would not recognize the extension Clark seeks. Therefore, Clark bears the burden of demonstrating Modern's refusal to report its executives' reimbursed auto expenses on their 1990 W–2 forms was indeed illegal under federal tax law. After analyzing that tax law, we hold that Clark's belief that the auto expense reimbursements he questioned were reportable as income in 1990 by Modern's executives and therefore subject to withholding by Modern, though reasonable, was wrong. Accordingly, we will affirm the district court's order granting Modern's motion for summary judgment on Clark's claim.

---

1. While this Court has held Pennsylvania recognizes a public policy exception to its otherwise strict adherence to the employment at-will doctrine, the Pennsylvania Supreme Court has mentioned that exception only in dictum. *See infra* note 6 and accompanying text.

## I.

From September 26, 1986, until his termination on February 28, 1991, Clark served as Vice–President of Finance and Chief Financial Officer of Modern. He was a knowledgeable financial officer and a Certified Public Accountant.

In 1986, Modern employed Runzheimer International ("Runzheimer") to fashion a plan for reimbursement of company employees who used their own automobiles for company business which would provide it and its employees with optimal tax benefits. Runzheimer installed a Fixed and Variable Rate Allowance ("FAVR") plan. Under it, twenty-nine percent of an employee's auto expense reimbursement was treated as taxable income, but the remaining seventy-one percent was excluded from income as employee business related expense.

In 1988, Congress amended I.R.C. § 62's provisions on the tax treatment of employees' reimbursed business expenses. *See* 26 U.S.C.A. § 62(a)(2)(A), (c) (West Supp.1993). Thereafter, in 1989, the Treasury Department and the Internal Revenue Service ("IRS") began considering regulations to implement the Code's changes in the income tax treatment of reimbursed expenses. Among the issues considered was the means by which an employee could "substantiate" the fact that an expense was incurred in the "ordinary and necessary" pursuit of the employer's business.

■ In general, under the Internal Revenue Code and the regulations, employee reimbursements or allowances for ordinary and necessary business expenses the employee incurs in the pursuit of his or her employer's business are not reportable, subject to withholding or included in the employee's income so long as the employee is required to account to his employer for them. The accounting must be adequate and an accounting is not adequate without substantiation. *See* 26 U.S.C.A. § 274(d) (West Supp.1993);

26 U.S.C.A. § 6001 (1989); *see also* James W. Pratt et al., *Individual Taxation* 415 (1988).

Reimbursements that exceed the amount substantiated must be included in the employee's gross income. *See* Temp.Treas.Reg. § 1–62–2T(e), 54 Fed.Reg. 51021 (1989). IRS initially considered the effect of the 1988 changes in Revenue Procedure 89–66, 1989–2 C.B. 792. Later, in 1990, IRS published Revenue Procedure 90–34. It addressed reimbursements for auto expenses that an employer paid to its "control group" employees inadequately accounted for under plans similar to Modern's FAVR plan. Thus, Revenue Procedure 90–34 brought into serious question the legality of excluding certain executives' auto expense reimbursements from the executives' income and the Code's withholding requirements under a FAVR-type plan. *See* Rev.Proc. 90–34, 1990–1 C.B. 553.

Modern became aware of the effect these changes and proposed changes could have in the tax treatment of its payments to its employees for their auto expenses some time in the summer of 1990. Kraig Rodenbeck, a Runzheimer employee, told Modern that he considered IRS Revenue Procedure 90–34 to be effective as of June 1990. If this were right, the auto expenses Modern had been paying its control group employees would be taxable income unless they could be substantiated, as that term was defined by the temporary tax regulations the Treasury Department had proposed, but not finally approved.[2] Rodenbeck also informed Modern, however, that IRS would be satisfied if it showed it had tried in good faith to comply in 1990 but could not do so until 1991.

In the meantime, Runzheimer had also had a separate opinion letter prepared for its own use by Peat Marwick, its tax advisor.[3] In its opinion, Peat Marwick had concluded that the regulatory changes resulting from issuance of Revenue Procedures 89–66 and 90–34 made employer auto expense reimbursements "to employees that qualify as covered

---

**2.** *See* 26 U.S.C.A. § 274(d) (West Supp.1993) (requiring substantiation for § 162 traveling expenses and authorizing IRS to set forth methods by which substantiation would be deemed); Temp.Treas.Reg. § 1.62–2T(e) (setting forth sim-

plified methods of substantiation or deemed substantiation).

**3.** Peat Marwick also happened to be Modern's accountant.

employees" (therefore excluding "control group" employees) under a FAVR plan subject to withholding if reimbursement was in excess of any amounts substantiated. With respect to reimbursements that are not substantiated, Peat Marwick was of the opinion that any amounts paid to employees who did not elect the standard mileage allowance of twenty-six cents per mile would have to be included in the employee's income and reported on the employee's W-2 form. Peat Marwick did not give an opinion on the effective date of the requirement that excess reimbursement to control group employees had to be included in their W-2 forms.

After reviewing Peat Marwick's report, Runzheimer sent a letter to Modern, dated November 9, 1990, urging it to "seek counsel from your tax advisors relative to compliance with Revenue Procedure 90–34...." Appellant's Appendix ("App.") at 58. Runzheimer's November 9, 1990 letter also advised Modern that it should have begun withholding taxes on auto expense reimbursements to control group employees on July 1, 1990.

In September or October of 1990 Clark had himself become aware of Modern's potential liability for withholding under its FAVR plan. Then, after reviewing the text of the statutory changes, the regulations IRS proposed in order to implement them and other material explaining their effect, Clark concluded that Revenue Procedures 89–66 and 90–34 had indeed required Modern to begin withholding federal income taxes and paying federal employment taxes on the auto expenses it was reimbursing to its control group employees. At a meeting near the end of 1990, Clark advised Modern's management that Modern would have to report auto expense reimbursements as income to its control group employees on the 1990 W-2 forms that the tax Code required it to distribute by January 31, 1991.

Clark instructed Bruce Pflaumer ("Pflaumer"), Modern's Assistant Controller, to prepare a summary of the potential additional income the control group employees would have under the new IRS regulations. Clark also directed John Lauf ("Lauf"), Modern's Controller, to get ready to issue supplemental W-2 forms to control group employees

showing the additional income Pflaumer's summary was expected to show for them. Lauf contacted Carl Wilkinson ("Wilkinson"), one of the affected employees, about how to break the bad news to the control group employees. Wilkinson told Lauf that the problem would be brought up at a management meeting on January 25, 1991. On December 17, 1990, however, unbeknownst to Clark or the others at Modern, Treasury issued a final regulation on employee expenses, Treasury Regulation § 1.62–2. It stated that the new procedures concerning inclusion of auto expenses in an employee's income and the consequent requirement that tax on them be withheld would not become effective until January 1, 1991. Treas.Reg. § 1.62–2(m) (1990).

Clark and Modern's managers apparently remained in ignorance of the final regulation on January 25, 1991, the date of the meeting at which the problem was to be discussed. At the meeting, Clark presented Pflaumer's summary. It showed nine of Modern's officers would have to report an aggregate $28,-053.00 additional income for 1990 because of the auto expenses Modern had reimbursed them. These officers objected to Modern's issuing W-2 forms to them that would add reimbursed auto expenses to their 1990 income. One officer is supposed to have said, when he had spoken with Runzheimer about the issue, that he was told not to worry about 1990 because the IRS was so backed up that compliance would not be necessary in 1990. Apparently concerned about his own liability if taxes were not withheld, Clark asked Modern to seek an opinion from Runzheimer stating that supplemental W-2 forms were not needed for 1990.

One of the officers told Clark that Modern would not ask Runzheimer to give any opinion on the taxability of the auto expenses. Clark then asked Modern to get advice from its own counsel. Modern again refused and John F. Smith, Modern's President, ordered Clark not to include any auto expense reimbursement in the control group employees' W-2 forms and to so instruct Lauf. Clark replied that he was not going to tell Lauf to issue or sign W-2 forms which left out the additional taxable income Clark had conclud-

ed Modern's control group employees had received in the form of auto expense reimbursement in 1990.

After the January 25, 1991 meeting, Clark had nothing more to do with the reporting of auto expenses and Modern terminated him on February 28, 1991. Modern did not report or withhold taxes on the auto expenses it gave its control group employees in 1990 and Lauf did not show any of these reimbursements on Modern's officers' W–2 forms.

## II.

After his discharge, Clark filed this diversity action in the district court claiming that Modern wrongfully discharged him for opposing an illegal corporate action. In his initial complaint, Clark also asserted violations of Pennsylvania's Whistleblower Law, Pa.Stat.Ann. tit. 43, §§ 1422–1428 (1991), and a claim against Modern, Smith, and ten unnamed "John Doe" defendants for tortious interference with his employment contract. Later, Clark amended his complaint to drop the Whistleblower claim[4] and the claims against the ten John Doe defendants. This left only a wrongful discharge claim, Count I, and a tortious interference claim, Count II. The district court dismissed Count II on March 16, 1992, leaving only the wrongful discharge claim.

After the close of discovery, Modern filed a motion for summary judgment as to Count I. Clark opposed it. By a memorandum and order dated November 4, 1992, 1992 WL 332260, entered the next day, the district court granted Modern's motion for summary judgment. On December 3, 1992, Clark filed a timely notice of appeal.

## III.

■ The district court had subject matter jurisdiction over this diversity action under 28 U.S.C.A. § 1332 (West Supp.1993). Because the district court's order of Novem-

ber 4, 1992 disposed of all claims, we have appellate jurisdiction over Clark's appeal under 28 U.S.C.A. § 1291 (West 1993). A motion for summary judgment should be granted only if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts that could alter the outcome are "material facts," *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986), and disputes are "genuine" if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. A plaintiff, on the other hand, must point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law. *See Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989).[5]

## IV.

■ When we sit in diversity, we apply the substantive law of the forum. When the application of that law is not clear, as in the case before us, we must forecast the position the supreme court of the forum would take on the issue. *See, e.g., Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Micromanolis v. Woods School, Inc.,* 989 F.2d 696, 699 (3d Cir.1993). As we stated in *Bruffett v. Warner Communications, Inc.,* 692 F.2d 910 (3d Cir.1982),

[W]e are not free to follow our own inclinations as to the manner in which the common law should develop or to decide whether creation of a common law remedy for discrimination ... would be a wise and

---

4. In Pennsylvania, statutory Whistleblower claims can only be asserted by public employees against government officials. *See* Pa.Stat.Ann. tit. 43, § 1422 (defining "employee" as one who performs services for wages for a public body); *Krajsa v. Keypunch, Inc.,* 424 Pa.Super. 230, 622 A.2d 355, 359–60 (1993).

5. For purposes of summary judgment, we will, as already stated, take as true Clark's allegations that Modern terminated him for his objection to the tax treatment of the automobile reimbursement. It is also undisputed that Clark was an at-will employee.

progressive social policy. We are instead constrained by the requirement that in diversity cases, "a federal court must be sensitive to the doctrinal trends of the state whose law it applies, and the policies which inform the prior adjudications by the state courts."

*Id.* at 918 (quoting *Becker v. Interstate Properties,* 569 F.2d 1203, 1206 (3d Cir.1977) (footnote omitted), *cert. denied,* 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978)). Our review of the district court's prediction and application of state law is plenary. *Borse v. Piece Goods Shop, Inc.,* 963 F.2d 611, 613 (3d Cir.1992). On the issue of wrongful discharge, it is the law of Pennsylvania that controls, and we turn first to it, reserving for later consideration the issue of federal tax law that will determine whether the acts Modern fired Clark for refusing to perform were in fact violations of law.

### A.

Under Pennsylvania law, an at-will employee of a private sector employer "can be terminated for good reason, bad reason, or no reason at all." *Nix v. Temple Univ.,* 408 Pa.Super. 369, 596 A.2d 1132, 1135 (1991). In *Geary v. United States Steel Corp.,* 456 Pa. 171, 319 A.2d 174 (1974), however, the Pennsylvania Supreme Court intimated that there might be an exception to this rule:

> It may be granted that there are areas of an employee's life in which his employer has no legitimate interest. An intrusion into one of these areas by virtue of the employer's power of discharge might plausibly give rise to a cause of action, particularly where some recognized facet of public policy is threatened.... We hold only that where the complaint itself discloses a

plausible and legitimate reason for terminating an at-will employment relationship and no clear mandate of public policy is violated thereby, an employee at will has no right of action against his employer for wrongful discharge.

*Id.* 319 A.2d at 180. The Pennsylvania Supreme Court has never actually held that the public policy exception gives a private sector at-will employee a common law cause of action for wrongful discharge,[6] but the intermediate Pennsylvania appellate courts have done so while explicitly noting the narrow confines of any public policy exception to Pennsylvania's doctrine of employment at-will. *See, e.g., Burkholder v. Hutchison,* 403 Pa.Super. 498, 589 A.2d 721, 723–24 (1991) (the clearly mandated public policy must "strike[ ] at the heart of a citizen's social right, duties and responsibilities") (quotation omitted); *Yetter v. Ward Trucking Corp.,* 401 Pa.Super. 467, 585 A.2d 1022, 1025 (exception recognized in "only the most limited of circumstances") (quotation omitted), *alloc. denied,* 529 Pa. 623, 600 A.2d 539 (1991); *Hineline v. Stroudsburg Elec. Supply Co.,* 384 Pa.Super. 537, 559 A.2d 566, 568 ("The public policy exception is a narrow one."), *alloc. denied,* 524 Pa. 628, 574 A.2d 70 (1989); *see also Paul v. Lankenau Hosp.,* 524 Pa. 90, 569 A.2d 346, 348 (1990) ("[e]xceptions to this rule have been recognized in only the most limited of circumstances") (quoting *Clay v. Advanced Computer Applications, Inc.,* 522 Pa. 86, 559 A.2d 917, 918 (1989)).

Both this Court and the Pennsylvania courts have "decline[d] 'to define ... the perimeters' of such a public policy exception in Pennsylvania," *see Bruffett,* 692 F.2d at 918 (quoting *Geary,* 319 A.2d at 180), but

---

**6.** The statement in *Geary* recognizing that some circumstances could trigger a public policy exception to Pennsylvania's rigid employment at-will doctrine is dicta. *See Paul v. Lankenau Hosp.,* 524 Pa. 90, 569 A.2d 346, 348 (1990) ("The Court [in *Geary* ] specifically answered in the negative to the central question of 'whether the time has come to impose judicial restraints on an employer's power of discharge.' "); *Clay v. Advanced Computer Applications, Inc.,* 522 Pa. 86, 559 A.2d 917, 923 (1989) (Nix, C.J., concurring) ("Contrary to the Superior Court's view, this Court did not announce a cause of action for

wrongful discharge in *Geary*."). On a number of occasions, this Court, however, has held that the Pennsylvania employment at-will doctrine has a public policy exception. *See, e.g., Borse v. Piece Goods Shop, Inc.,* 963 F.2d 611, 617 (3d Cir. 1992); *Smith v. Calgon Carbon Corp.,* 917 F.2d 1338, 1343 (3d Cir.1990); *Woodson v. AMF Leisureland Centers, Inc.,* 842 F.2d 699, 701–02 (3d Cir.1988). In the absence of a clear statement by the Pennsylvania Supreme Court to the contrary or other persuasive evidence of a change in Pennsylvania law, this panel is bound by the holding of these cases. *See* Third Circuit Internal Operating Procedure 9.1 (1993).

instead have invoked a "case-by-case" approach. *Smith v. Calgon Carbon Corp.*, 917 F.2d 1338, 1344 (3d Cir.1990) (citing *Turner v. Letterkenny Federal Credit Union*, 351 Pa.Super. 51, 505 A.2d 259, 261 (1985)). From the cases, we can, nevertheless, draw certain principles that govern what an employee must show to make out a claim for wrongful discharge under Pennsylvania's public policy exception to the principle of at-will employment. Thus, we have stated that an at-will employee invoking Pennsylvania's public policy exception must show his discharge offended a clear mandate of public policy by

> result[ing] from conduct on the part of the employee that is required by law or from the employee's refusal to engage in conduct prohibited by law. "The public policy exception has been most frequently applied under Pennsylvania law when the discharge is a result of the employee's compliance with or refusal to violate the law."
> ... We see little evidence in the Pennsylvania cases to date that an alleged public interest will be recognized as a "clear mandate of public policy" in the absence of a legislative or constitutional endorsement in the form of a specific prohibition, requirement or privilege.

*Smith*, 917 F.2d at 1344 (quoting *Woodson v. AMF Leisureland Centers, Inc.*, 842 F.2d 699, 701–02 (3d Cir.1988) (footnote and other citations omitted)).[7]

Absent a violation of law, it is difficult for an at-will employee seeking recovery for wrongful discharge to point to a common law, legislative or constitutional principle from which a clear public policy exception to Pennsylvania's doctrine of at-will employment could be inferred. Clark's claim that an at-will employee need show only a reasonable belief in the illegality of the requested activity does, however, raise a serious issue that requires close analysis. He advances two basic arguments in support of it: (1) employees should be protected when they attempt to expose the wrongdoing of their employer; and (2) an employer's wrongful motives should not be vindicated just because its activity ultimately turned out to be lawful.

■ After carefully considering these arguments, however, we predict, for the following reasons, that Pennsylvania will not recognize a wrongful discharge claim when an at-will employee's discharge is based on a disagreement with management about the legality of a proposed course of action unless the action the employer wants to take actually violates the law.

### B.

Our analysis begins with the facts of *Geary,* the state supreme court case that first intimated that Pennsylvania law has a public policy exception to its strict adherence to the doctrine of at-will employment in the private sector. In *Geary,* a salesman of tubular products believed that the products had been inadequately tested and so were dangerous to the user. He took his concerns to the vice-president in charge of sales. Ultimately, the employer withdrew the products from the market, but discharged the employee. *Geary,* 319 A.2d at 175. Despite the employee's good intentions and the product's withdrawal that vindicated his position, the supreme court upheld his discharge. It said the employee's motives were praiseworthy, but it held that good motives do not overcome the strong presumption in favor of at-will employment. *Id.* at 179–80. Thus, in *Geary,* the Pennsylvania Supreme Court refused to allow a cause of action for wrongful discharge on the basis of the employee's intention to benefit the public, even where his belief that the acts he objected to as dangerous to the public was arguably vindicated.[8]

---

7. We recognize that this Court did not need to determine in *Smith* "whether a 'clear mandate of public policy' may exist in the absence of a specific directive legislatively or constitutionally imposed." *Id.* Our decision in *Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611 (3d Cir.1992), can be read to relax the requirement of a specific legislative or constitutional prohibition, but *Borse* is distinguishable. *See* discussion *infra.*

8. The company in *Geary* denied that the new product was withdrawn from the market as a result of Geary's efforts. The court did not find it necessary to resolve this fact dispute when the complaint had been dismissed on preliminary objections. *Id.* 319 A.2d at 175 n. 3.

Clark's argument that an at-will employee's cause of action for wrongful discharge can be founded on the reasonableness of the employee's belief that the employer proposes a violation of law is similar to the argument addressed in *Geary*. Clark asks us to protect an employee who had good intentions without regard to whether the public has been protected from a violation of law. Indeed, Clark's argument goes beyond the employee's argument in *Geary*. There, although the factual dispute was not resolved, the employee's beliefs were arguably vindicated. In *Geary*, though the plaintiff attempted to expose a dangerous product and arguably ultimately contributed to its removal from the market, he was denied recovery. Therefore, *Geary* rejects a cause of action for wrongful discharge based on the employee's intentions to benefit the public, even when his willingness to oppose his employer ultimately confers a benefit on the public.

Later cases in the superior court support our analysis of *Geary*. In *McGonagle v. Union Fidelity Corp.*, 383 Pa.Super. 223, 556 A.2d 878 (1989), *alloc. denied*, 525 Pa. 584, 575 A.2d 115 (1990), the defendant allegedly terminated an at-will employee for refusing to participate in an insurance policy mailings that the employee believed violated state insurance laws. *Id.* 556 A.2d at 879–80. The employee failed to point to the violation of any specific statute. *Id.* 556 A.2d at 885. In reversing common pleas' judgment for the employee, the superior court stated:

> An employee who is also a professional has a dual obligation: to abide by federal and state laws, in addition to staying within the bounds of his/her professional code of ethics. Such responsibility may necessitate that the professional forego the performance of an act required by his/her employer. *However, when the act to be performed turns upon a question of judgment, as to its legality or ethical nature, the employer should not be precluded from conducting its business where the professional's opinion is open to question.*

Instantly, it was the position of the defendants that the "policy filing problems" were minor in nature and easily reconciled without the loss of revenue or the contravention of any state's insurance requirements, a matter we find to be more akin to a difference of opinion and not a request to have the plaintiff perform an "illegal" or unethical act in furtherance of corporate profits.

*Id.* (emphasis added) (citations omitted). In *McGonagle*, the reasonableness of the employee's belief that the requested activity violated the law was not considered. The superior court concerned itself only with the question of actual violation. *Id.*

In *Hineline v. Stroudsburg Electric Supply Co.*, 384 Pa.Super. 537, 559 A.2d 566 (1989), the employer discharged an at-will employee for disconnecting the employer's surveillance cameras. The employee argued that these cameras violated the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa.Cons.Stat.Ann. § 5703(1) (West Supp.1993), because the employer used them for the "secretive taping of a customer's or an employee's conversation in a retail establishment." *Id.* 559 A.2d at 569 n. 2. The superior court felt the employee's claim was based on two premises: (1) he should be protected because his intentions were good; and (2) he was attempting to prevent an illegal act by his employer. It rejected the claim. *Id.* at 569. It held the discharge did not violate a clearly defined mandate of public policy. It relied in part on the fact that the employee was not charged by law with enforcement of the statute; he had no authority, nor statutory right, to disengage the surveillance system and was taking the law into his own hands. *Id.* at 569–70.

In *Reese v. Tom Hesser Chevrolet–BMW*, 413 Pa.Super. 168, 604 A.2d 1072 (1992), the employee, a car salesman, was terminated after refusing to help cover the employer's losses on used vehicle sales which had been incurred when the salesman allegedly provided incorrect information to the bank that was financing the sales. *Id.* 604 A.2d at 1073. The employee alleged that the dealer was attempting to extort money from him in violation of the Pennsylvania Crimes Code, 18 Pa.Cons.Stat.Ann. § 3923(a)(7) (West 1983). *Id.* at 1074. After concluding that the demand for payment was not extortionate, the court stated: "It may well be that the action of the employer was unfair to [the plaintiff]; however, it still does not rise to the level of a

public policy violation." *Id.* at 1075. In analyzing the statute on extortion, the court again gave no consideration to the reasonableness of the employee's belief or the bad intentions of the employer. It focused instead on the legality or illegality of the demand.

Recently, in *Krajsa v. Keypunch, Inc.*, 424 Pa.Super. 230, 622 A.2d 355 (1993), the court rejected an at-will employee's claim for wrongful discharge where the employee alleged his employer terminated him after he threatened to reveal the employer's unlawful billing practices. *Id.* 622 A.2d at 356. The court held that the public policy exception to Pennsylvania's employment at-will doctrine did not apply where the plaintiff failed to point to a specific statute that either justified his act or made the one the employer proposed to take unlawful. *Id.* at 357–59. Again, the court did not consider whether the employee's belief that the billing practices he questioned were unlawful was reasonable. We believe these cases stand for the proposition that the good intentions of an employee who refuses to carry out an employer's orders which he believes unlawful fail to make out a claim for wrongful discharge.

Only three reported Pennsylvania cases have ever granted relief from wrongful discharge on the basis of public policy and in each there was either an infringement of constitutional rights or an actual violation of the text or plain legislative intent of a statute designed to protect the public from serious harm. *See Field v. Philadelphia Elec. Co.*, 388 Pa.Super. 400, 565 A.2d 1170 (1989) (employee, hired as expert in nuclear safety, discharged for making statutorily required report to Nuclear Regulatory Commission under Energy Reorganization Act, 42 U.S.C.A. § 5846 (West 1983)); *Hunter v. Port Auth.*, 277 Pa.Super. 4, 419 A.2d 631 (1980) (denial of public employment to pardoned individual because of assault conviction, which had no relevance to fitness for job, violated public policy embodied in Article I, Section 1 of Pennsylvania Constitution interpreted to guarantee an individual's right to engage in any of the common occupations);

*Reuther v. Fowler & Williams, Inc.*, 255 Pa.Super. 28, 386 A.2d 119 (1978) (interference with at-will employee's duty to serve on jury, a duty expressly protected by statute).

Though federal courts have taken a somewhat more expansive view of the public policy exception to a private sector employer's unfettered right to discharge at-will employees, no federal case has permitted a Pennsylvania at-will employee to recover for wrongful discharge when he merely believes that the act he objected to was illegal. Instead, each case that permitted recovery involved an act that would be illegal or infringe upon a fundamental private right. *See, e.g., Borse*, 963 F.2d at 620–24 (strong public policy favoring right of privacy implicated by dismissal due to refusal to consent to urinalysis testing and personal property searches); *Woodson*, 842 F.2d at 702 (dismissal for refusal to serve alcohol to visibly intoxicated individual, an act prohibited by Pa.Stat.Ann. tit. 47, § 4–493(1) (West Supp.1993)); *Novosel v. Nationwide Ins. Co.*, 721 F.2d 894, 899–900 (3d Cir.1983) (dismissal based on refusal to participate in political lobbying on behalf of employer, a violation of First Amendment rights); *Perks v. Firestone Tire & Rubber Co.*, 611 F.2d 1363 (3d Cir.1979) (dismissal for refusal to take polygraph test in face of state statute forbidding employer from requiring such test as condition for continued employment).

The principle Clark proposes would, in contrast, give an at-will employee a cause of action for wrongful discharge whenever an employee could show he reasonably believed the employer's acts will violate the law. No state or federal court applying Pennsylvania law has yet upheld an action for wrongful discharge based on what an at-will employee thought was right.

Our holding in *Borse* is not to the contrary. There, we held that a strong public policy favoring a right of privacy evidenced in Pennsylvania common law made actionable the discharge of at-will employees who refused to submit themselves to urine tests for drugs. *Borse*, 963 F.2d at 620–24. Though we did not find in the Pennsylvania constitution a right of privacy that precluded an employer from requiring its employees to furnish urine samples as part of a drug prevention program, we inferred such a right from the Pennsylvania common law on tortious invasion of privacy. *Id.* at 620, 623 n.

12; *cf. id.* at 626–27 (Hutchinson, J., dissenting from denial of rehearing in banc) (noting "public policy on which [*Borse*] relies is not expressed in either the Pennsylvania Constitution, Pennsylvania's statutory law or in existing Pennsylvania Supreme or Superior Court decisions"). Clark's case is different. It does not involve any public policy expressed in the common law of Pennsylvania, or otherwise, that could be analogous to the policy in favor of an individual right to privacy which informed our decision in *Borse.* Moreover, we do not think *Borse* should be extended to create a public policy exception to Pennsylvania's employment at-will doctrine which would prevent private employers from discharging employees who persist in opposition to company policy based on the employee's own interpretation of ambiguous law.

Clark also relies on *McNulty v. Borden, Inc.,* 474 F.Supp. 1111 (E.D.Pa.1979) and *Levito v. Hussman Food Service Co.,* Civ.A. No. 89–5967, 1990 WL 1426 (E.D.Pa. Jan. 8, 1990). He argues that the district court did not, in either of those cases, require an employee to prove that the activity which led to their discharge was, in fact, illegal. Clark's reliance is misplaced.

In *McNulty,* the employee alleged that he was discharged because he refused to commit a crime or participate in an illegal pricing scheme. *McNulty,* 474 F.Supp. at 1114. The court held only that these allegations, if proven, would state a cause of action. *Id.* at 1119. *McNulty* is entirely consistent with our holding that a violation of clear public policy is not generally present unless the employee shows an actual violation of the law. Indeed, the employee in *McNulty* ultimately lost his case for wrongful discharge because he could not establish that the employer's proposal which he opposed actually violated the law. *See McNulty v. Borden, Inc.,* 542 F.Supp. 655, 658 (E.D.Pa.1982) ("We cannot accept plaintiff's contention that his termination contravened any clear public policy absent a finding that the [statute] was violated.").

*Levito* was a claim by an at-will employee who alleged that his employer terminated him for refusal to engage in an act that would have resulted in an illegal kickback under 18 Pa.Cons.Stat.Ann. § 4108 (1983). *Levito,* 1990 WL 1426 at *2–3. As in *McNulty,* the claim survived a pre-trial motion to dismiss. It did so not because the plaintiff had a reasonable belief in the illegality of the conduct the employer proposed, but because the employee's evidence, if believed, would have shown he was terminated for refusal to engage in an illegal activity. *Id.* 1990 WL 1426, at *3. We have already held that termination for that reason is actionable in Pennsylvania. *See, e.g., Woodson,* 842 F.2d at 702 (request to serve drunken individual); *Perks,* 611 F.2d at 1365–66 (request to take polygraph test prohibited by law). In refusing to dismiss Levito's complaint, however, the district court implied that a Pennsylvania at-will employee bears the burden of demonstrating the act demanded is illegal. It stated:

> In the case sub judice, plaintiff was allegedly directed to participate in or aid and abet unlawful conduct. This Court agrees that the doctrine of employment at-will grants far-reaching powers to the employer. However, these powers do not extend to directing an employee to participate in alleged unlawful activity in order to maintain his employment.... Plaintiff's allegations, *if proven at trial,* could support a conclusion by the trier of fact that defendant's discharge of plaintiff was wrongful.

*Levito,* 1990 WL 1426 at *3 (emphasis added). In the end, as in *McNulty,* the employee lost because he was unable to prove an actual violation of a clear public policy. *See Levito v. Hussman Food Serv. Co.,* Civ.A. No. 89–5967, 1991 WL 86898 (E.D.Pa. May 16, 1991) (granting summary judgment for defendants because First Amendment does not give employee right or duty to voice disagreement with or concern over propriety of company policy).[9]

■ When an employer that is engaging, or is about to engage, in an illegal activity seeks to coerce its employees into participating in that activity or condoning it by silence, the public's interest in exposing unlawful activities overrides the doctrine of employment at-will. The public policy exception to the

---

**9.** It is not clear why the district court initially permitted the plaintiff in *Levito* to go forward with allegations of a termination for refusal to participate in an illegal scheme but ultimately

doctrine of employment at-will does not exist, however, to protect the employee. Rather it is the protection of society from public harm, or the need to vindicate fundamental individual rights, that undergird an at-will employee's common law action for wrongful discharge in Pennsylvania. *See Field,* 565 A.2d at 1180 (public has interest in being protected from radiation dangers and plaintiff had statutory duty to act); *Reuther,* 386 A.2d at 121 (public "necessity of having citizens freely available for jury service" is recognized public policy).

■ The employee's good intentions are not enough to create a cause of action for wrongful discharge, as *Geary* clearly demonstrates. If an employee can avoid discipline whenever he reasonably believes his employer is acting unlawfully, it is the employee, not the public, who is protected by the good intentions. A company acting within the law is presumed to pose no threat to the public at large. The creation of a cause of action based on an employee's reasonable belief about the law would leave a private employer free to act only at the sufferance of its employees whenever reasonable men or women can differ about the meaning or application of a law governing the action the employer proposes. The effect such a rule might have on corporate governance and the efficient operation of private business organizations is not insignificant. On reason and authority, we therefore conclude that a clear violation of public policy depends on an actual violation of law.

### C.

■ Alternately, Clark argues that the Pennsylvania Whistleblower Law, Pa.Stat. Ann. tit. 43, §§ 1421–1428 (1991), by analogy, demonstrates the clear mandate of public policy needed to save his claim of wrongful discharge. To the contrary, we think that statute weakens his case. By its terms, the Whistleblower Law applies only to public employees. In *Krajsa,* the Pennsylvania Su-

perior Court expressly held that the Whistleblower Law is not an indicator of public policy in private discharge cases. It held the Act's text belies any general public policy of protecting whistleblowers who are not employed in the public sector. *Krajsa,* 622 A.2d at 360. Though other states have enacted statutes giving private sector employees protections similar to the protection the Pennsylvania Whistleblower Law gives public employees,[10] Pennsylvania has not.

### D.

■ In still another alternate argument, Clark contends that Modern violated a clear public policy, regardless of the ultimate legality of its actions, because it *thought* it was acting illegally and so discharged Clark because he challenged its intent to act outside the law. Clark points to no Pennsylvania authorities that indicate an employer who discharges an employee because the employee refuses to perform an act they mutually, though incorrectly, believe unlawful is liable for wrongful discharge in the absence of illegal discrimination. In fact, Pennsylvania case law indicates the contrary. In *Geary,* the supreme court was unmoved by the employee's claim that the company intended to distribute dangerous and untested products absent his intervention. *See Geary,* 319 A.2d at 178–79. In *Hineline,* the superior court never addressed the employer's belief that the activity it proposed was illegal but focused instead on the propriety of the employee's acts. *See Hineline,* 559 A.2d at 569–70.

In support of this argument, Clark refers extensively to scholarly commentary and authority in other jurisdictions. Reasoned scholarly opinion and the views of other state courts are sometimes useful in a diversity case in predicting the course the law will take in the jurisdiction whose law governs. *See Becker,* 569 F.2d at 1212–13. Under *Erie,* however, our task is to predict what the Pennsylvania courts will do. When cases in other states and opinions of scholars concerning an employer's liability for wrongful dis-

---

did not mention that ground in granting summary judgment in favor of the employer. Instead, the district court concluded that the First Amendment protection did not extend to an employee's criticism of the employer's unlawful conduct.

10. *See, e.g., Cal.Labor Code* § 1102.5(b) (West 1992); *Conn.Gen.Stat.Ann.* § 31–51m(b) (West 1992); *Haw.Rev.Stat.* §§ 378–61, 378–62 (1992); *La.Rev.Stat.Ann.* § 30:2027 (West 1992) (reporting of environmental violations).

charge because the employer unilaterally has, or the employer and the discharged employee share, a mistaken belief that the act the employee objects to or refuses to perform violates the law are in conflict with the trend of Pennsylvania's law on the subject, they are not persuasive under *Erie. See id.* at 1214.[11] Under existing case law, we conclude that Pennsylvania will not allow recovery for wrongful discharge based only on a showing that an employer faced with ambiguous law was willing to engage in a course of conduct it wanted to pursue without regard to its legality.

### E.

█ Finally, we hold that an at-will employee's reasonable fear of adverse personal consequence if he follows his employer's directions is insufficient to make out an action for wrongful discharge in Pennsylvania. Again, we see no indication that the supreme court of that state is willing to stretch Pennsylvania's narrow public policy exception to the doctrine of employment at-will that far. Imposition of liability on the employer based on the employee's fear of personal responsibility for actions he reasonably, but erroneously, fears are in violation of law would permit an employee to use the public policy exception for his own benefit instead of the public benefit.

### V.

For all these reasons, we predict the Pennsylvania Supreme Court would not recognize a cause of action for wrongful discharge based either on an employee's reasonable belief that the employer's act is unlawful or an employer's belief that the act the employee objects to is unlawful, unless the act proposed is in fact unlawful or the motive for the discharge is illegal invidious discrimination. Modern is liable to Clark for wrongful discharge only if Clark's recommendation that Modern include the 1990 auto expense it paid its control group employees on their W–2 forms for that year was actually required by law. In that case, his discharge would violate public policy and be actionable under

Pennsylvania law because it resulted from his refusal to help Modern's officers conceal or evade federal income tax. *See Field,* 565 A.2d at 1180. Accordingly, we must still consider Clark's argument that Modern's officers were acting in violation of law when they refused to follow Revenue Procedures 89–66 and 90–34 for the purpose of avoiding or concealing the adverse income tax consequences that following them entailed.

Although a decision on the legality or illegality of a particular act often requires a resolution of disputed issues of fact that would preclude summary judgment, here the question is one of law and thus suitable for resolution on a motion for summary judgment. It is undisputed that Modern never issued to its directors and officers any W–2 forms that reflected their receipt of excess auto expense reimbursement in 1990. The only issue presented on this aspect of Clark's case is whether federal tax law required inclusion of these expenses on control group employees' W–2 forms during 1990. Unfortunately, resolution of the purely legal issue, whether this conduct was unlawful, requires us to go into the thicket of the Internal Revenue Code and the thorns of the regulations and procedures IRS uses to implement it. Thus, we turn to the issue of whether Modern's rejection of Clark's recommendation that it report the auto expenses it paid to its control group employees in 1990 on the W–2 forms it issued those employees was a violation of federal tax law on January 25, 1991 when Modern rejected Clark's advice.

### A.

In the Tax Reform Act of 1986, Congress had provided that employees need not declare or report as taxable income business expenses which their employer reimbursed to them or paid for them. *See* 26 U.S.C.A. § 62(a)(2)(A) (West 1988). In 1988, however, Congress amended § 62 of the Internal Revenue Code by adding subsection (c). It requires employees to include reimbursed business expenses in their income unless they were paid or received under a plan that required the employee to return any excess

---

11. Clark also argues at some length, and Modern disputes, that the company's request could have subjected him to personal and civil penalty. Because we hold that an employee's reasonable

belief is not enough, we think it unnecessary to decide whether Clark would have faced liability had the law been as he believed it to be.

he or she could not substantiate as an ordinary and necessary business expense incurred to further the employer's business. *See* 26 U.S.C.A. § 62(c) (West Supp.1993). In general, the 1988 amendments applied to taxable years beginning on or after January 1, 1989, *see* Pub.L. 100–485, § 702(b), October 13, 1988, 102 Stat. 2426, but Congress delegated to the Treasury Department the task of promulgating interpretive regulations to implement their details. One of the undecided details was the definition of an acceptable means for substantiation of employee business expenses. *See* 26 U.S.C.A. §§ 62(c), 274(d) (West Supp.1993).

In December 1989, acting under authority Congress had delegated to it, Treasury proposed temporary regulations to implement the substantiation requirement of §§ 62(c) and 274. In the temporary regulations, Treasury sub-delegated to IRS the authority to design standards for deciding whether any particular reimbursement plan would meet the 1988 Act's substantiation requirement. Temp.Treas.Reg. § 1.62–2T(e)(2) (1989). With respect to per diem or mileage allowances, this temporary regulation precluded IRS from deciding that any plan for paying or reimbursing such employee business expenses met the requirement of substantiation unless it was "reasonably calculated not to exceed the amount of the employee's expenses or anticipated expenses." Temp. Treas.Reg. § 1–62–2T(f)(2). If the plan was not "reasonably calculated" to limit employee reimbursement to actual business expense, it had to require employees to return to the employer any excess allowance beyond actual business expense. *Id.* The temporary regulation did not specifically define excess or state how it was to be treated, other than to state that the employee must be required to refund "any portion of such allowance which relates to days or miles of travel not substantiated in accordance with paragraph (e) of this section." *Id.* The temporary treasury regulation also provided that the provisions in § 1.62–2T regulating other expense allowances and reimbursements would be "effective for taxable years beginning on or after January 1, 1989, with respect to expenses paid or incurred in taxable years beginning on or after January 1, 1989." Temp.

Treas.Reg. § 1.62–T, 54 Fed.Reg. 51021, 51022 (Dec. 12, 1989).

As of the beginning of December 1989, however, it was not yet clear that the FAVR plan Runzheimer had created for Modern's use under the 1986 Tax Reform Act complied with the 1988 Act's new requirements concerning accountability, substantiation and return of excess. In late 1989 IRS addressed these problems in Revenue Procedure 89–66. That procedure set out an optional standard mileage rate of twenty-six cents that employees could use in computing the deductible costs of operating an automobile for business purposes after January 1, 1990. Use of the twenty-six cents per mile standard rate was not mandatory. An employee could use the expenses he actually incurred if they could be substantiated by adequate records or other sufficient evidence of their occurrence, nature and purpose. Rev.Proc. 89–66, § 1, 1989–2 C.B. 792. This 1989 revenue procedure also set forth rules for determining what means of substantiation were acceptable. It did not define the term substantiation itself. Thus, Revenue Procedure 89–66 still left Modern in the dark about whether its FAVR plan met the 1988 Act's substantiation requirement and the extent to which any auto expense reimbursements it paid in 1990 to employees who did not elect the standard mileage rate were excess reimbursements that had to be included in the employees' 1990 W–2 forms because they were not adequately accounted for and Modern's FAVR plan did not require their repayment of the unaccounted-for excess.

In June of 1990, IRS released Revenue Procedure 90–34. It stated that FAVR plans like Modern's were an acceptable method to substantiate employee auto expense reimbursements for all but "control employee[s]." Rev.Proc. 90–34, 1990–1 C.B. 554. By implication, Revenue Procedure 90–34 also required companies that were reimbursing "control employees'" auto expenses under FAVR type plans to withhold taxes and include all auto expense reimbursement in the control employees' W–2 forms. The "control employees," however, were not necessarily taxable on the excess. They could elect the mileage method and, if they did not so elect, they could still exclude from income any

amounts they could themselves substantiate from their own contemporaneously created records.

Revenue Procedure 90–34 was not to be IRS's last word on the issue that put Clark at odds with his employer and led to his discharge. On December 17, 1990, Treasury issued its final regulation on auto expenses. *See* Treas.Reg. § 1.62–2(h)(2)(i)(B) (1990). It superseded Temporary Treasury Regulation § 1.62–2T(e)(2) (1989). The final regulation, like the temporary one, provided that excess reimbursements for auto expenses were to be treated as payments under a non-accountable plan which had to be reported as income by the employee receiving them, but final Treasury Regulation § 1.62–2(m) also provided that excess reimbursements under § 1.62–2(h)(2)(i)(B) of the final regulation would not be includable in the employee's income *until January 1, 1991.* Treas.Reg. § 1.62–2(m) (1990).

▮ Treasury regulations take precedence over contrary revenue procedures because the latter are intended primarily as a guide to taxpayers. *See Flanagan v. United States,* 810 F.2d 930, 934 (10th Cir.1987) (Revenue Rulings are accorded less weight than regulations); *see also Virginia Educ. Fund v. C.I.R.,* 799 F.2d 903 (4th Cir.1986) (Revenue Procedures are mere guidelines without force of law); *United States v. Toyota of Visalia,* 772 F.Supp. 481, 486 (E.D.Cal. 1991) (Revenue Procedure does not have force of law and is therefore not binding on IRS), *aff'd,* 988 F.2d 126 (9th Cir.1993). Clark grounds his argument on the Temporary Treasury Regulation and Revenue Procedure 90–34. But neither the temporary regulation nor the revenue procedures issued before the final regulation answered or finally decided the legal issue whether Modern's 1990 reimbursement of its control group employees' auto expenses had to be reported on their W–2 forms. Not until the final regulation was issued on December 17, 1990, was that issue settled and then it was settled in favor of Modern and against Clark. The final regulation set January 1, 1991, as the first reporting date. It controls Revenue Procedure 90–34 which, in combination with Revenue Procedure 89–66, had previously purported to require reporting in 1990. Accordingly, Clark's argument that Modern's control group employees had income which they failed to report in violation of law until the final Treasury Regulation was published on December 17, 1990, fails.

**B.**

▮ We also reject Clark's contention that the uncertainties that attend his dispute with Modern about the legal effect of the treasury regulations make this case inappropriate for summary judgment. A court may resolve any legal issue that does not depend upon the resolution of disputed facts on a Rule 56 motion for summary judgment. As we have demonstrated in our discussion of the Pennsylvania law on wrongful discharge, the reasonableness of Clark's beliefs about the requirement of the federal tax law is irrelevant. Modern's refusal to include excess auto reimbursement in its control group employees' 1990 W–2 forms and their obligation to report those reimbursements on their own returns was legally settled in their favor on December 17, 1990, when the final regulation on the subject postponed the new requirements for substantiation to 1991. Therefore, the district court did not err in disposing of the case on Modern's Rule 56 motion for summary judgment.

**VI.**

If Clark had refused to engage in an act that was, in fact, illegal at the time it was to be done, but was later made retroactively legal by an authoritative legislative or regulatory change, this case would be more difficult. Here, however, Clark refused to issue the W–2 forms as Modern directed in January 1991. At that time, the final treasury regulation which repudiated his incorrect, but reasonable, belief that reporting was already required had been in force for more than a month. Modern did not act unlawfully when it instructed Clark not to report its control group employees' auto expense reimbursements for the 1990 calendar year as income on their 1990 W–2 forms. In January 1991 when Clark took his stand on the issue contrary to his employer's wishes, neither Clark nor Modern had any legal duty to report Modern's control group employees' auto expense allowances as income on their 1990 W–2 forms. The best that can be said

for Clark is that he took a reasonable view about a legal issue that had not been finally determined. The final regulation was promulgated on December 17, 1990, before the January 25, 1991 meeting at which the dispute that led to his discharge occurred. Clark has not shown he resisted an order by Modern to violate the law. Thus, his discharge was not wrongful under Pennsylvania law.

Clark has failed to show that his discharge violated any clear mandate of public policy that would make his discharge wrongful under Pennsylvania law. Therefore, the district court's grant of summary judgment will be affirmed.

MANSMANN, Circuit Judge, dissenting.

I respectfully dissent because the evidence, viewed in Clark's favor, shows that Modern Group's control employees fired Clark in order to evade taxes. The majority asserts that, under Pennsylvania law, an employer's intent to break the law will violate public policy only when an actual violation of the law occurs. I dissent because I believe that Pennsylvania—like every state—has an implicit but strong public policy that requires good faith compliance with state and federal laws, a policy entirely consistent with the cases cited by the majority.

### I.

The majority appears to accept that Clark's evidence would suffice to convince a jury that Modern fired Clark with the intent to evade taxes. Three examples illustrate. When Clark first brought the regulation to the board's attention, one board member responded, in effect, "Don't report it and we won't get caught." Later, when asked why the board would not seek the advice of tax counsel, one board member said, "That ought to be obvious." Finally, the day before the next board meeting at which Clark could have renewed his argument and questioned why his position was omitted from the minutes of the last meeting, he was fired.

### II.

As the facts, viewed in Clark's favor, illustrate, this case is not one in which "the act to be performed turns upon a question of judgment." *Compare McGonigle v. Union Fidelity Corp.*, 383 Pa.Super. 223, 556 A.2d 878, 885 (1989). Nor is this case one in which the employee went beyond the scope of his statutory responsibility or beyond the scope of his employment position. *Compare Hineline v. Stroudsburg Electrical Supply Co.*, 384 Pa.Super. 537, 559 A.2d 566 (1989), in which the employee disconnected surveillance cameras but was neither charged by law with enforcing Pennsylvania's wiretap law nor responsible for his employer's compliance with it.

Moreover, this case is not one in which the employee complains of illegality but fails to point to any statute for support. *Compare Krajsa v. Keypunch, Inc.*, 424 Pa.Super. 230, 622 A.2d 355 (1993); *McGonigle*, 556 A.2d at 878. Both *Krajsa* and *McGonigle* appear to require the employee to come forward with objective support. That requirement thus implicitly makes relevant both the employee's and the employer's "objective" good faith.

Finally, I agree that Pennsylvania cases indicate that an employer does not necessarily violate public policy when acting unethically or reprehensibly. *See Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974) (marketing defective product); *Reese v. Tom Hesser Chevrolet–BMW*, 413 Pa.Super. 168, 604 A.2d 1072 (1992) (threat to fire at-will employee was not extortion). The employer's actions here, however, came too close to actually being illegal. Indeed only the majority's interpretation (itself subject to debate) of the regulation prevents Clark from asserting that Modern Group actually violated the law. Although the doctrine of "legal impossibility," upon which the majority relies, has its place as a defense to criminal prosecution, it should have no place in wrongful discharge suits because to apply it as the majority does would countenance an employer's illegitimate attempt to subvert the law rather than an employer's legitimate interest in disagreeing with an employee about what the law requires. The majority thus necessarily reads Pennsylvania law to place professionals such as Mr. Clark in a precarious situation when faced with an employer that wishes to break the law.

I would therefore hold, albeit narrowly, that, under the following condition, a professional states a cause of action under Pennsylvania's public policy exception to at-will employment: (1) the professional has urged the employer, with specific statutory support, that the law requires a course of conduct; (2) the employer believes that the employee's interpretation of the statute is correct and fires the employee to avoid having to comply with the law. Clark has met both of these conditions and thus should be held to have withstood his employer's motion for summary judgment.

## III.

For the foregoing reasons I would vacate the judgment of the district court and remand for submission to a jury the genuine issue of material fact, namely, whether Modern discharged Clark because Clark refused to cooperate in Modern's alleged effort to violate the law.

SUR PETITION FOR REHEARING

Dec. 22, 1993.

Present SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH and LEWIS, Circuit Judges.

The petition for rehearing filed by appellant in the above captioned matter having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.