

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-18-1999

# Hurley v. Atl Cty Pol Dept

Precedential or Non-Precedential:

Docket 96-5633,96-5661

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Hurley v. Atl Cty Pol Dept" (1999). *1999 Decisions.* Paper 67.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/67

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 18, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 96-5633, 96-5634, 96-5661, 96-5738

SERGEANT DONNA M. HURLEY; PATRICK K. HURLEY,
husband and wife,

v.

THE ATLANTIC CITY POLICE DEPARTMENT,
a subdivision of the City of Atlantic City;
HENRY MADAMBA; NICHOLAS V. RIFICE;
JOHN MOONEY; JOHN DOES 1 THROUGH 50
inclusive, fictitious name defendants, jointly,
severally, and in the alternative

(Camden New Jersey District Civil No. 93-260)

SERGEANT DONNA M. HURLEY; PATRICK K. HURLEY,
wife and husband

v.

THE ATLANTIC CITY POLICE DEPARTMENT,
a subdivision of the City of Atlantic City;
HENRY MADAMBA; NICHOLAS V. RIFICE;
JOHN MOONEY; JOHN DOES 1 THROUGH 50,
inclusive, jointly, severally, and in the alternative

(Camden, New Jersey District Civil No. 94-1122)

Atlantic City Police Department,
        Appellant No. 96-5633

SERGEANT DONNA M. HURLEY; PATRICK K. HURLEY,
husband and wife,

v.

THE ATLANTIC CITY POLICE DEPARTMENT,
a subdivision of the City of Atlantic City;
HENRY MADAMBA; NICHOLAS V. RIFICE;
JOHN MOONEY; JOHN DOES 1 THROUGH 50,
inclusive, fictitious name defendants, jointly,
severally, and in the alternative

(Camden New Jersey District Civil No. 93-260)

SERGEANT DONNA M. HURLEY; PATRICK K. HURLEY,
wife and husband

v.

THE ATLANTIC CITY POLICE DEPARTMENT,
a subdivision of the City of Atlantic City;
HENRY MADAMBA; NICHOLAS V. RIFICE;
JOHN MOONEY; JOHN DOES 1 THROUGH 50,
inclusive, jointly, severally, and in the alternative

(Camden, New Jersey District Civil No. 94-1122)

Henry Madamba,
        Appellant No. 96-5634

SERGEANT DONNA M. HURLEY; PATRICK K. HURLEY,
husband and wife,

v.

THE ATLANTIC CITY POLICE DEPARTMENT,
a subdivision of the City of Atlantic City;
HENRY MADAMBA; NICHOLAS V. RIFICE;
JOHN MOONEY; JOHN DOES 1 THROUGH 50,
inclusive, fictitious name defendants, jointly,
severally, and in the alternative

(Camden New Jersey District Civil No. 93-260)

SERGEANT DONNA M. HURLEY; PATRICK K. HURLEY,
wife and husband

v.

THE ATLANTIC CITY POLICE DEPARTMENT,
a subdivision of the City of Atlantic City;
HENRY MADAMBA; NICHOLAS V. RIFICE;
JOHN MOONEY; JOHN DOES 1 THROUGH 50,
inclusive, jointly, severally, and in the alternative

(Camden New Jersey District Civil No. 94-1122)

Donna M. Hurley, and Patrick K. Hurley,
        Appellants No. 96-5661

SERGEANT DONNA M. HURLEY; PATRICK K. HURLEY,
husband and wife,

v.

THE ATLANTIC CITY POLICE DEPARTMENT,
a subdivision of the City of Atlantic City;
HENRY MADAMBA; NICHOLAS V. RIFICE;
JOHN MOONEY; JOHN DOES 1 THROUGH 50,
inclusive, fictitious name defendants, jointly,
severally, and in the alternative

(Camden New Jersey District Civil No. 93-260)

SERGEANT DONNA M. HURLEY; PATRICK K. HURLEY,
wife and husband

v.

THE ATLANTIC CITY POLICE DEPARTMENT,
a subdivision of the City of Atlantic City;
HENRY MADAMBA; NICHOLAS V. RIFICE;
JOHN MOONEY; JOHN DOES 1 THROUGH 50,
inclusive, jointly, severally, and in the alternative

(Camden, New Jersey District Civil No. 94-1122)

Donna M. Hurley, and Patrick K. Hurley,
        Appellants No. 96-5738

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Nos. 93-cv-00260, 94-cv-01122)

57

Argued May 4, 1998
Reargued October 5, 1998

BEFORE: BECKER, Chief Judge, SCIRICA and COWEN,
Circuit Judges

(Filed March 18, 1999)

V. The Hurleys' Remaining Claims

Hurley argues that the district court abused its discretion
by denying her motion for an additur. While the basis for
her claim is not entirely clear, she appears to suggest that
she is entitled to an additur because the district court's
jury charge erroneously limited liability to the accrual
period (January 20, 1987 through January 20, 1993), even
though there was ample evidence in the record that
defendants continued to harass her through the end of
trial. Although she has filed a related action to include
these later claims, she has advised the court "that she
would be willing to forego her compensatory claims in that
other action were this Court to exercise its appellate
jurisdiction in the form of an additur." Appellee's Br. at 38–
39. Yet the Hurleys filed their original complaint in this
action on January 20, 1993. Since that date, they have not
amended their complaint to include any claims for conduct
that occurred after that time; those claims remain in their
related action. Clearly, the district court did not abuse its
discretion by denying an additur based on claims that were
never before the court.

Hurley next claims that the district court erred by
denying her prejudgment interest on the remitted
compensatory award. In Coleman v. Kaye, 87 F.3d 1491 (3d
Cir. 1996), cert. denied, 117 S. Ct. 754 (1997), we
considered whether a plaintiff could recover prejudgment
interest against the County of Monmouth after a jury found
the County liable under the LAD for intentional sexual
discrimination. In rejecting such an award, we observed:

> Nor can prejudgment interest be assessed against the
> County of Monmouth. The court rule that Coleman

58

invokes expressly provides that prejudgment interest
will not be awarded against a public entity "[e]xcept
where provided by statute . . . ." N.J. Ct. R. 4:42-11(b).
There is no statutory authorization in New Jersey for
such an award. To the contrary, as the New Jersey
Appellate Division stated in Maynard v. Mine Hill
Township, 244 N.J. Super. 298, 582 A.2d 315, 318
(App. Div. 1990), the New Jersey Tort Claims Act
"specifically prohibits prejudgment interest against
government tortfeasors."

Id. at 1511-12 (citation omitted). Accordingly, we will affirm
the district court's denial of plaintiff's motion for
prejudgment interest.

Mr. Hurley argues that the district court erred by
granting summary judgment on his loss of consortium
claim under the LAD. Specifically, he asserts that the LAD
permits recovery of all damages available under the
common law, and a claim for loss of consortium is "more
accurately described as an element of damage rather than
a separate cause of action . . . ." Appellee's Br. at 42. He
further asserts that a claim for loss of consortium under
the LAD effectuates the remedial purposes of the statute by
providing compensation for the damage done to his marital
relationship.

Although the New Jersey Supreme Court has not
answered the question of whether per quod damages for
loss of consortium are recoverable under the LAD, the
Superior Court of New Jersey, Appellate Division, firmly
rejected such a claim in Catalane v. Gilian Instrument
Corp., 638 A.2d 1341 (N.J. Super. Ct. App. Div. 1994).
Specifically, the court held that "the Legislature did not
intend to establish a cause of action for any person other
than the individual against whom the discrimination was
directed." Id. at 1353 (citing N.J. Stat. Ann. S 10:5-3); cf.
Flaherty v. Enclave, 605 A.2d 301, 305 (N.J. Super. Ct. Law
Div. 1992) (per quod damages are not recoverable under the
Conscientious Employee Protection Act, or "whistleblower"
statute). In reaching this conclusion, the Catalane court
reasoned that "[i]f per quod claims were to be allowed under
the Act, the Legislature would have so noted in light of its
careful recitation of the damages it intended to allow."

59

Catalane, 638 A.2d at 1353. Because the court's holding rests on a sensible reading of the LAD, we predict that the New Jersey Supreme Court would follow Catalane and conclude that the LAD makes no provision for such an ancillary claim. Accordingly, the district court properly granted summary judgment as to Mr. Hurley's loss of consortium claim.

Finally, plaintiff's counsel argues that the district court erred by setting his hourly rate at $200, rather than his requested hourly rate of $300. Counsel contends that, although his requested rate was supported by an independent affidavit, the court instead relied on "an unsworn hearsay letter from a senior partner in a law firm that routinely defends Atlantic City Police Department representatives." Appellee's Br. at 40. Counsel further contends that the court based the $200 rate on a generalized sense of what is customary and proper, rather than on appropriate record evidence.

We review the reasonableness of an award of attorney's fees for an abuse of discretion.34 See Smith v. Philadelphia Housing Auth., 107 F.3d 223, 225 (3d Cir. 1997); Washington v. Philadelphia County Ct. of Common Pleas, 89 F.3d 1031, 1034 (3d Cir. 1996). As we observed in Smith:

> [A] district court may not set attorneys' fees based upon a generalized sense of what is customary or proper, but rather must rely upon the record. The plaintiff bears the burden of producing sufficient evidence of what constitutes a reasonable market rate for the essential character and complexity of the legal

_____

34. Although "[t]he New Jersey approach to the issue of contingency enhancement under the LAD is a marked departure from the Supreme Court's interpretation and application of federal fee-shifting statutes," Coleman, 87 F.3d at 1511 (citing Rendine v. Pantzer, 661 A.2d 1202 (N.J. 1995)), the New Jersey Supreme Court's approach to reviewing the calculation of hourly rates under the LAD is generally similar to the approach taken by this court when reviewing the calculation of hourly rates under federal fee-shifting statutes. See Rendine, 661 A.2d at 1227 (citing Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990)). Accordingly, we will review the district court's hourly-rate calculation in
light of federal precedent.

services rendered in order to make out a prima facie case. Once the plaintiff has carried this burden, defendant may contest that prima facie case only with appropriate record evidence. In the absence of such evidence, the plaintiff must be awarded attorney's fees at her requested rate. If the hourly rates are disputed, the district court must conduct a hearing to determine the reasonable market rates.

107 F.3d at 225 (quotation marks and citations omitted).

In the present matter, the district court found that the proposed fees of plaintiff 's counsel were excessive for the following reasons:

The defendants have submitted an affidavit accompanied by a letter from Jack Plackter, Esq., of the law firm of Horn, Goldberg, Gorny, Daniels, Plackter & Weiss. Mr. Plackter writes that his firm charges the following rates: partners, $95–$225; associates, $85–$150; paralegals, law clerks, and other unlicensed legal assistants, $50–$70.

We believe that Mr. Plackter's submitted rates provide a more suitable framework in which to set fees. Based on Mr. Plackter's letter, the other evidence in the record, the Court's close familiarity with the New Jersey legal market, our direct experience with Mr. Van Syoc and his employees, and applicable case law, we will apply the following hourly rates: Mr. Van Syoc: $200.00; Mr. Folkman: $150.00; Mr. Blaker: $115.00; Junior Associates (Allen, Kopelson, Erdek, Byler): $85.00; Law Clerks and Paralegals: $50.00.

933 F. Supp. at 428.

To the extent that the district court's calculation of hourly rates was based on a "generalized sense of what is customary and proper," rather than on evidence in the record, it was error. Smith, 107 F.3d at 225. However, because defendants submitted an affidavit to contest the hourly rates, and because plaintiff's counsel waived any right to a hearing on this issue,35 we cannot conclude that

_____

35. The district court explicitly provided that the parties could have a hearing on the attorney's fee issue if they requested one, see Hurley, 933

61

the district court abused its discretion in concluding that
the $200 hourly rate is proper under the circumstances.
Accordingly, we will affirm the district court's order
granting plaintiff attorney's fees subject to a reduced rate.
However, in light of our decisions with respect to the
individual defendants in this case, we will vacate the fee
award order insofar as it established the total hours worked
on successful claims and the total fee award and remand
for reconsideration.

VI.

For the foregoing reasons, we will affirm the amended
judgment insofar as it imposes liability on the ACPD.
However, we will vacate the amended judgment to the
extent it awards punitive damages against the ACPD and
order a new trial on this issue. Moreover, we will vacate the
amended judgments entered against defendant Madamba
and in favor of defendant Rifice, but affirm the district
court's order granting Mooney's motion for summary
judgment. Finally, we will affirm the district court's orders
dismissing Mr. Hurley's loss of consortium claim, denying
plaintiff's motions for prejudgment interest and an additur,
and granting plaintiff's motion for attorney's fees subject to
a reduced hourly rate.

_____

F. Supp. at 429 n.31, but the record does not reveal that any such
hearing ever occurred. Moreover, plaintiff's counsel has not argued for
a hearing on appeal. Instead, he continues to argue that he is entitled
to his proposed hourly rate of $300 because defendants have not
submitted appropriate record evidence to challenge this rate. This
amounts to a waiver. See Williams v. Butler, 802 F.2d 296, 301 (8th Cir.
1986) (en banc), vacated on other grounds sub nom. City of Little Rock v.
Williams, 485 U.S. 931 (1988).

COWEN, Circuit Judge, concurring in part, and dissenting in part.

I agree with the majority that a new trial is necessary with respect to defendants Madamba and Rifice. I also agree that the District Court's instruction to the jury regarding liability for punitive damages under the New Jersey Law Against Discrimination ("LAD") constituted plain error, and that the District Court properly dismissed Mr. Hurley's loss of consortium claim, denied plaintiff's motion for prejudgment interest and an additur, and granted plaintiff's motion for attorneys' fees subject to a reduced hourly rate.

I must respectfully part company with the majority, however, insofar as they affirm the judgment of liability against the ACPD. The District Court instructed the jury that it could find Madamba and the ACPD liable based on, among other theories, quid pro quo sexual harassment. But the District Court's instruction on this subject was erroneous because it did not require that the juryfind that plaintiff suffered a tangible employment action as a result of her refusal to submit to her supervisor's sexual demands. Moreover, even if the jury instruction was correct, there is simply no evidence to support plaintiff's quid pro quo claim. Because the jury was asked only to return a general verdict as to the defendants' liability without specifying which theory of liability it credited, it is possible that the jury assessed liability against the ACPD based on a legally and factually flawed theory. Under these circumstances, both Supreme Court and Third Circuit authority require that we vacate the judgment against the ACPD. The majority's adoption of a harmless error doctrine to salvage the tainted general verdict in this case is both contrary to precedent and exceedingly unwise.

I also dissent from the majority's prediction of New Jersey law that there is no cause of action against individual supervisors for their own acts of sexual harassment under LAD S 10:5-12(a). Numerous decisions of the New Jersey courts, including the New Jersey Supreme Court itself, support Hurley's contention that supervisors such as Rifice and Madamba are "employer[s]" within the meaning of S 10:5-12(a). The majority's holding to the contrary

63

erroneously substitutes our assessment of the LAD in place of the New Jersey courts' interpretation of their own statute. Finally, because there is sufficient evidence from which a jury could conclude that defendant Mooney aided and abetted Madamba and the ACPD in creating a hostile work environment, I would reverse the District Court's grant of summary judgment in his favor.

I. Quid Pro Quo Liability

The District Court charged the jury that the ACPD and Madamba could be liable based on four separate and distinct theories of sex discrimination: (i) intentional discrimination; (ii) hostile work environment; (iii) retaliation; and (iv) quid pro quo. With respect to quid pro quo sexual harassment, this court has held:

> [U]nwelcome sexual advances, request for sexual favors, and other verbal or physical conduct of a sexual nature constitute [quid pro quo] sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment [or] (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual.

Bonenberger v. Plymouth Township, 132 F.3d 20, 27 (3d Cir. 1997) (internal quotation omitted). Similarly, the New Jersey Supreme Court, interpreting the LAD in Lehman v. Toys `R Us, 626 A.2d 445 (1993), stated that "quid pro quo sexual harassment occurs when an employer attempts to make an employee's submission to sexual demands a condition of his or her employment. It involves an implicit or explicit threat that if the employee does not accede to the sexual demands, he or she will lose his or her job, receive unfavorable performance reviews, be passed over for promotions, or suffer other adverse employment consequences." Id. at 452.

Our understanding of quid pro quo sexual harassment has been altered by the Supreme Court's decision in Burlington Indus., Inc. v. Ellerth, 118 S. Ct. 2257 (1998). In Ellerth, the Court granted certiorari to decide whether a plaintiff may state a claim for quid pro quo sexual

64

harassment "where the plaintiff employee has neither submitted to the sexual advances of the alleged harasser nor suffered any tangible effects on the compensation, terms, conditions, or privileges of employment as a consequence of a refusal to submit to those advances?" 118 S. Ct. at 2265. Notwithstanding this question, the Court determined that the critical issue in the case was the scope of employer liability, not the contours of quid pro quo sexual harassment. As the Court made clear, for the purposes of determining employer liability, the categories of quid pro quo and hostile work environment are not controlling. Id. Still, the Court acknowledged that the categories "are relevant when there is a threshold question whether a plaintiff can prove discrimination" to the extent that "they illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general." Id. According to the Supreme Court, cases such as Ellerth, which involve only unfilled threats and no tangible employment action, are properly categorized as hostile work environment claims, not quid pro quo claims. Id. Accordingly, to prove a claim of quid pro quo sexual harassment, a plaintiff must demonstrate either that she submitted to the sexual advances of her alleged harasser or suffered a tangible employment action as a result of her refusal to submit to those sexual advances. See Newton v. Cadwell Labs., 156 F.3d 880, 883 (8th Cir. 1998) (discussing quid pro quo claims after Ellerth); Ponticelli v. Zurich American Ins. Group, 16 F. Supp. 2d 414, 428 (S.D.N.Y. 1998) (same).

In this case, the District Court instructed the jury regarding quid pro quo sexual harassment as follows:

> Finally, quid pro quo sexual harassment. Loosely translated, quid pro quo means, this for that. To prove quid pro quo sexual harassment, plaintiff must prove by a preponderance of the evidence that someone with supervisory authority over her engaged in conduct that conditioned tangible job benefits including compensation, promotion, and other terms, conditions or privileges of employment on submission to unwelcome sexual conduct or penalized her for refusing to participate in such conduct.

65

App. at A5280. Although the District Court's instruction would have been acceptable under Bonenberger and Lehman, it fails under Ellerth. Most problematically, the instruction did not require that plaintiff prove that she actually suffered a tangible employment action as a result of her refusal to submit to her supervisor's sexual advances. As the majority acknowledges, Maj. Op. at 37, the instruction permitted the jury to find liability for quid pro quo sexual harassment if a supervisor conditioned a tangible job benefit on plaintiff 's submission to a sexual demand, even if the supervisor never actually penalized plaintiff for her failure to submit. Because quid pro quo liability based on such unfulfilled threats is incompatible with Ellerth, the District Court's instruction on this subject was erroneous.[1]

Even if the District Court's quid pro quo instruction could be read to require a finding that plaintiff actually suffered a tangible employment action as a result of her refusal to submit to her supervisor's sexual demands, the claim should not have been submitted to the jury because there is no evidence to support it. The only factual basis for plaintiff's quid pro quo claim is Madamba's statement to Hurley that women frequently sleep with their bosses in order to gain protection against sexual harassment. In the same conversation, Madamba also told plaintiff that he had lost weight by "having sex a few times a day" and that

_____

1. Citing the fact that the LAD is "in some respects broader and more flexible than Title VII," the majority suggests that the New Jersey Supreme Court may reject Ellerth and Faragher v. City of Boca Raton, 118 S. Ct. 2275 (1998), and adhere to the view that the loss of a tangible employment benefit is not an essential element of a quid pro quo claim under the LAD. Maj. Op. at n.19. I wholeheartedly agree with the majority that the LAD is a remedial statute that should be liberally construed, but presented with no evidence that the New Jersey Supreme Court would reject two widely-heralded and watershed opinions of the United States Supreme Court, I believe the wiser course is to assume that the New Jersey Supreme Court will follow Ellerth and Faragher. Ironically, the majority abandons its expansive view of the LAD when it comes to predicting whether New Jersey law recognizes a cause of action against individual supervisors for their own acts of discrimination, even in the face of substantial evidence that New Jersey courts already recognize such a claim. See Infra Section II.A.

66

women came to him "when they're ready." Plaintiff contends, quite plausibly, that this conversation was a solicitation for sex. But this does not establish a quid pro quo claim unless plaintiff also proves that she suffered a tangible employment action as a result of her refusal to submit to Madamba's advances. There is simply no proof of this. Plaintiff has never even alleged that there is a causal connection between her failure to submit to Madamba's advances and any tangible employment action that she may have suffered.2 In light of Ellerth, plaintiff cannot maintain a quid pro quo claim, and defendants were entitled not to have this unsubstantiated theory submitted to the jury.

The majority, while conceding that plaintiff's quid pro quo claim is "the least tenable of Hurley's claims," Maj. Op. at 37, nevertheless attempts to justify its submission by suggesting that a reasonable jury could have determined that Madamba had plaintiff transferred from Charlie Platoon to a less desirable position in the Property and Evidence Unit because she refused his sexual advances. Id. at n.26. This theory, while imaginative, is without foundation in the record. Plaintiff has never argued, either to this Court or the District Court, that there was a nexus between that transfer and her failure to submit to Madamba's sexual advances.3 And for good reasons. According to plaintiff, Madamba's sexual overtures to her

_____

2. The District Court suggested that there was sufficient evidence to support plaintiff 's quid pro quo claim because plaintiff 's refusal to submit to Madamba's advances arguably resulted in the loss of the "tangible job benefit of being free from harassment." Hurley v. Atlantic City Police Dep't, 933 F. Supp. 396, 408 (D.N.J. 1996). This is a misapprehension of the concept of a tangible employment action, as Ellerth makes clear. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, 118 S. Ct. at 2268. "Being free from harassment" does not equate to any of these categories.

3. Plaintiff argued to the District Court that the "transfer was in retaliation for complaints of harassment." App. at A5428 (plaintiff's statement of contested facts). Likewise, plaintiff has argued to this court that the transfer resulted from her "complain[ts] of sexual harassment." Hurley Letter, July 20, 1998 at 2.

67

occurred on March 26, 1990. Plaintiff testified that this date stood out in her mind because it was her husband's birthday. App. at A2497:4-6. But plaintiff was not transferred to the Property and Evidence Unit until November 8, 1990, approximately one week after she submitted a memorandum in which she detailed the harassment that she suffered at Charlie Platoon and requested a transfer. Hurley, 933 F. Supp. at 406. In addition, the transfer was authorized by the Acting Chief of Police, not by Madamba, who as a captain did not have the authority to transfer plaintiff or anyone else. Accordingly, while plaintiff has argued, and a reasonable jury could conclude, that plaintiff 's transfer to the Property and Evidence Unit was in retaliation for her sexual harassment complaints, the notion that the transfer was somehow connected to plaintiff 's failure to submit to Madamba's sexual advances over seven months earlier is implausible in the extreme, and no reasonable jury could so find based on the present record.

We are thus presented with a situation where a jury has returned a general verdict of liability against the defendants, but one of the theories on which that verdict may have rested was both improperly presented and was not supported by the evidence. Under these circumstances, our precedents could not be more clear. "Where a jury has returned a general verdict and one theory of liability is not sustained by the evidence or legally sound, the verdict cannot stand because the court cannot determine whether the jury based its verdict on an improper ground." Wilburn v. Maritrans GP Inc., 139 F.3d 350, 361 (3d Cir. 1998); see also Brokerage Concepts v. U.S. Healthcare, Inc., 140 F.3d 494, 534 (3d Cir. 1998); Limbach Co. v. Sheet Metal Workers Int'l Assoc., 949 F.2d 1211, 1217-18 (3d Cir. 1991) ("Under this court's jurisprudence, we must set aside a general verdict if it was based on two or more independent grounds one of which was insufficient, and we cannot determine whether the jury relied on the valid ground."), aff'd on rehearing en banc, 949 F.2d 1241 (3d Cir. 1991); Carden v. Westinghouse v. Electric Corp., 850 F.2d 996, 1000 (3d Cir. 1988); Avins v. White, 627 F.2d 637, 646 (3d Cir. 1980); Simko v. C & C Marine Maintenance Co., 594

68

F.2d 960, 967 (3d Cir. 1979); Albergo v. Reading Co., 372 F.2d 83, 86 (3d Cir. 1967).

Our decision in Carden, 850 F.2d at 996, is illustrative. In that case, plaintiff sued his former employer for age discrimination. At trial, plaintiff pressed two different theories: first, direct evidence of intentional discrimination; and second, circumstantial evidence of discrimination under the burden-shifting analysis of McDonnell Douglas v. Green, 411 U.S. 792 (1973). The jury returned a general verdict in plaintiff 's favor. On appeal, defendants successfully argued that the only testimony supporting plaintiff's intentional discrimination claim was erroneously admitted into evidence by the district court, and that without such testimony, there was insufficient evidence to support the claim of intentional discrimination. Although we recognized that there was more than sufficient evidence to support plaintiff's McDonnell Douglas claim, we nonetheless concluded that the general nature of the jury's verdict necessitated a new trial:

> Significantly, the jury's liability interrogatory, and hence the jury's answer, is in effect a general verdict. It did not distinguish between the two theories on which the district court charged: i.e. liability predicated on a finding of intentional discrimination, or liability predicated on an indirect finding grounded in the three-part McDonnell Douglas formula. Thus, unless we are satisfied that Carden proved both direct and indirect liability on the part of Westinghouse, we are compelled to reverse the judgment because the jury's verdict, general in nature, may have rested exclusively on a ground that is not supported by evidence. . . . In our jurisprudence it has been established that a general verdict must be set aside where the jury has been instructed that it could rely on two or more independent grounds or claims and one of those grounds or claims turns out to be insufficient.

Id. at 999-1000 (emphasis added) (internal citations omitted).

The Supreme Court has been equally consistent in holding that a general verdict in a civil case must be

69

reversed if any of the claims submitted to the jury are found to be unsound. Over a century ago, the Court explained that the general verdict's "generality prevents us from perceiving upon which plea they found. If, therefore, upon any one issue, error was committed, either in the admission of evidence or in the charge of the court, the verdict cannot be upheld . . .." Maryland v. Baldwin, 112 U.S. 490, 493 (1884). Since Baldwin, the Supreme Court has reaffirmed this rule, without exception, on at least three separate occasions. See Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co., 370 U.S. 19, 29–30 (1962); United New York & New Jersey Sandy Hook Pilots Assoc. v. Kalecki, 358 U.S. 613, 618–19 (1959); Wilmington Star Mining Co. v. Fulton, 205 U.S. 60, 78–79 (1907). Applying this well–settled principle to the facts of this case leads to the inevitable conclusion that the verdict against the ACPD and Madamba should be vacated because we do not know whether those defendants were found liable based on a quid pro quo theory that is both legally and factually defective.

Faced with the clear command of our prior cases, as well as the governing Supreme Court doctrine, the majority holds that even if plaintiff's quid pro quo claim was erroneously presented to the jury and lacked evidentiary support, the judgment against the ACPD should still be affirmed because, the majority declares, "no jury would have found the defendants liable based solely on[the] quid pro quo" claim, and therefore, "any error was harmless." Maj. Op. at 38. Although the majority claims that this is not a new rule, the fact of the matter is that prior to today's decision, this court has never relied on a harmless error analysis to affirm a general verdict that may have rested on an improper ground.4 It is remarkable that after more than

_____

4. The single Third Circuit decision cited by the majority in support of its
position is inapposite. In Murray v. United of Omaha Life Ins. Co., 145 F.3d 143 (3d Cir. 1998), our prediction of New Jersey law rendered the district court's jury charge erroneous, but we concluded that the jury verdict should nonetheless be affirmed because"the findings necessarily implied by the jury's verdict under the incorrect instructions make clear that the jury would have reached the same conclusion under the correct instructions . . .." Id. at 145–46. Here, in contrast, there is nothing in the

70

one hundred years of reviewing civil judgments founded on general verdicts, the majority believes that we have only now come upon the case that calls for such drastic action. I do not believe that that day has arrived.

The majority concludes that the evidence to support plaintiff's hostile work environment claim -- the sexually explicit graffiti and the sanitary napkin incident, in particular -- is so strong that there is no possibility that the jury assessed liability against the ACPD based solely on Madamba's alleged sexual advances. No one, save the

---

jury's general verdict that would support the notion that they would have reached the same result had the matter been submitted without the faulty quid pro quo claim. In addition, Murray was not a case involving a general verdict that may have been predicated on erroneous grounds, and it accordingly sheds no light on the issue presented herein.

I recognize that on rare occasion, some of our sister circuits, utilizing a harmless error analysis, have affirmed general verdicts that were tainted by defective claims. See Kern v. Levolor Lorentzen, Inc. 899 F.2d 772 (9th Cir. 1990); Traver v. Meshriy, 627 F.2d 934 (9th Cir. 1980); Collum v. Butler, 421 F.2d 1257 (7th Cir. 1970); American Airlines, Inc. v. United States, 418 F.2d 180 (5th Cir. 1969). Most of the circuits, however, have strictly adhered to the general rule announced in Baldwin. See Kern, 899 F.2d at 790 (Kozinski, J., dissenting) (citing cases). In particular, I note that Asbill v. Housing Authority of Choctaw Nation of Oklahoma, 726 F.2d 1499 (10th Cir. 1984), relied on by the majority for the allegedly "long [ ]acknowledged" proposition that Baldwin does not preclude the possibility of harmless error review, no longer represents the prevailing view of the Tenth Circuit. See Anixter v. Home-Stake Production Co., 77 F.3d 1215, 1229 (10th Cir. 1996) ("Although in the past we allowed jury verdicts to stand if the improper instruction was harmless . . . more recently we have adhered strictly to the general rule and have remanded cases where we could not say`with absolute certainty' that the jury was not influenced by the submission of improper and erroneous instruction.") (citations omitted); Farrell v. Klein Tools, Inc., 866 F.2d 1294, 1299-1301 (10th Cir. 1989) (acknowledging harmless error discussion in Asbill, but concluding that more recent cases left "no room for harmless error analysis," even though it was "very unlikely" that the erroneous jury instruction prejudiced defendant's "substantial rights"). In light of these cases, as well as the Supreme Court and Third Circuit precedents discussed in the text, I believe the majority's reliance on the sporadic harmless error cases from other circuits to be misplaced.

71

defendants perhaps, would dispute that plaintiff presented substantial evidence in support of her hostile work environment claim. But can any of us really purport to know how the jury viewed the evidence in this case? Any experienced trial lawyer can attest to the fact that juries sometimes view cases in suprising ways. Although one would not know it from the majority's opinion, according to the District Court, the facts in this matter were "hotly contested, and at trial there was conflicting evidence with respect to almost everything." Hurley, 933 F. Supp. at 404 n.4. For example, the defendants produced evidence that the graffiti, though by all accounts appalling, was promptly removed when ACPD supervisory personnel learned of its existence. There was also evidence that the graffiti was directed at both male and female officers. The sanitary napkin incident was the subject of conflicting testimony as well: several police officers testified that Madamba, upon seeing the display, immediately had it taken down and adamantly instructed his officers to cease such behavior. The point, of course, is not whether my colleagues or I would have credited these explanations if we were jurors; it is that the actual jurors in this case, consistent with their oaths and the instructions of the District Court, could have accepted the ACPD's defense to the hostile work environment claim, but still assessed liability on the faulty quid pro quo claim because they were convinced that Madamba propositioned Hurley for sex and threatened to retaliate if she did not submit. To recognize that this scenario may have occurred does not presume "total illogic" on behalf of the jury, as the majority asserts. Maj. Op. at 38. To the contrary, it assumes only that the jury carefully considered the evidence and followed the instructions of the District Court.5

_____

5. Even assuming that the jury did not find the ACPD and Madamba liable solely on the defective quid pro quo claim, its submission could have effected the jury's deliberations in less obvious ways. For example, the jurors may have been inclined to award more compensatory damages because they wrongly believed that the defendants had committed multiple forms of sexual harassment against plaintiff. The fact that the District Court felt compelled to remit the compensatory damages award from $575,000 to $175,000 is some indication that this may have occurred.

72

The invocation of a harmless error rule in this case is particularly misguided because it will produce no benefit to either the judicial system or the parties. As the Supreme Court has recognized, the chief justification of the harmless error doctrine is the conservation of judicial resources. See United States v. Hastings, 461 U.S. 499, 509 (1983) (quoting R. Traynor, The Riddle of Harmless Error 81 (1970)); see also 11 Wright et al., Federal Practice and Procedure S 2881 at 443 ("The theory of the harmless-error rule generally is that procedure is a practical means to an end, the requirements of which should be no more exacting than efficiency requires."). But in this case, as a consequence of our decision to vacate the punitive damages award against the ACPD and the liability judgments against Madamba and in favor of Rifice, the entire matter will have to be re-presented to a new jury. There is thus no efficiency advantage to support the majority's approach. Nor will the parties themselves be well-served by today's decision. The ACPD, for obvious reasons, would rather present their evidence to a new jury without defending against an unsubstantiated claim. Even the plaintiff, however, by being deprived of an opportunity to have a single jury review all of her claims and, if appropriate, assess both compensatory and punitive damages, will be disadvantaged by the majority's limited affirmance of only the remitted compensatory damages award against the ACPD.

Finally, I am very concerned that the majority's newly-minted harmless error analysis will invite further efforts by appellate judges, in even more difficult cases, to divine what a jury may have been thinking when it rendered a general verdict. Although the majority emphasizes that their decision to employ a harmless-error doctrine is founded upon the "extreme" facts of this case, Maj. Op. at 41, that is simply to say that we will only affirm a tainted general verdict in the future where we believe that the jury has reached an obviously correct result. Because I believe that we have no role in speculating how a jury might have viewed the evidence presented at trial, and that such attempts at judicial telepathy are unwise and contrary to our precedents, I respectfully dissent from the majority's decision to affirm the judgment against the ACPD.

II. Individual Liability Under the New Jersey Law
Against Discrimination

A.

In ordering a new trial for defendants Rifice and
Madamba, the majority has concluded that the only basis
for individual liability under the LAD is S 10:5-12(e), which
prohibits any person from aiding and abetting an act
prohibited by the LAD. In reaching this conclusion, the
majority has predicted that the New Jersey Supreme Court
would not recognize a cause of action against an individual
supervisor under S 10:5-12(a), which makes it unlawful for
any "employer" to discriminate on the basis of, among other
things, sex. Maj. Op. at 45-46. The majority believes that
interpreting S 10:5-12(a) to provide for individual liability of
supervisors would not substantially further the purposes of
anti-discrimination law and would be inconsistent with the
prevailing interpretation of Title VII, which does not give
rise to individual liability. See Sheridan v. E.I. DuPont de
Nemours & Co., 100 F.3d 1061, 1077-787 (3d Cir. 1996).
Because I find these reasons unconvincing in light of the
many New Jersey state court cases which strongly suggest
that New Jersey law recognizes a cause of action against
individual supervisors for their own acts of discrimination,
I dissent from the majority's holding to the contrary.

At the outset, it is worth noting that, viewed purely as a
matter of statutory construction, there is a more than
credible argument that the term "employer," as used in
N.J.S.A. S 10:5-12(a), was intended to encompass individual
supervisors. The governing definition of "employer" under
the LAD is found at N.J.S.A. S 10:5-5(e) and provides as
follows:

> `Employer' includes all persons as defined in
> subsection a. of this section unless otherwise
> specifically exempt under another section of this act,
> and includes the State, any political or civil subdivision
> thereof, and all public officers, agencies, boards or
> bodies.

Subsection (a) of S 10:5-5, in turn, states:

74

> `Person' includes one or more individuals,
> partnerships, associations, organizations, labor
> organizations, corporations, legal representatives,
> trustees, trustees in bankruptcy, receivers, and
> fiduciaries.

Based on these definitions, which indirectly define an
"employer" as "one or more individuals," it is reasonable to
conclude, as plaintiff urges, that the New Jersey legislature
intended to include individuals acting on behalf of their
employer (i.e., supervisors) within the coverage of the
statute. This is particularly so given the legislature's
instruction that the LAD is to be "liberally construed,"
N.J.S.A. S 10:5-3, and the New Jersey Supreme Court's
repeated recognition that "the goal of the LAD[is] `nothing
less than the eradication of the cancer of discrimination.' "
See Taylor v. Metzger, 706 A.2d 685, 693 (N.J. 1998)
(quoting Hernandez v. Region Nine Hous. Corp., 684 A.2d
1385 (N.J. 1996)) (additional citations omitted). Indeed, in
this case, plaintiff has an especially compelling argument
that defendants Rifice and Madamba ought to be subject to
liability under S 10:5-12(a) because "public officers" are
specifically included in the S 10:5-5(e) definition of
"employer." Although "public officers" is not defined in the
LAD, it is difficult to conceive of a definition of that term
that does not encompass a police inspector and a police
captain, which are, respectively, the second and third
highest ranking positions in the Atlantic City Police
Department.

All of this is to say that, even if we did not have the
benefit of New Jersey state court decisions and were
completely left to our own devices, the question of whether
Rifice and Madamba could be liable under LAD S 10:5-12(a)
is, as the majority acknowledges, a close one. Maj. Op. at
45-46. But see Tyson v. Cigna Corp., 918 F. Supp. 836, 839
(D.N.J. 1996) (holding that S 10-5:12(a) does not provide for
individual liability because it "does not include any of the
phrases that so clearly provide a basis for individual
liability under other subparts" of LAD). In matters involving
state law, however, our role is not to interpret a statute as
we deem it appropriate; instead, we must apply the law in
a manner that is consistent with the interpretation given to

75

it by the state's highest court. Where, as here, the New Jersey Supreme Court has not explicitly addressed the issue, we must "forecast the position" of that court. Clark v. Modern Group Ltd., 9 F.3d 321, 326 (3d Cir. 1993). In doing so, we should consider, inter alia, decisions of the New Jersey intermediate appellate courts as well as"[t]he `carefully considered statement[s]' of the Supreme Court in dicta." Travelers Indem. Co. of Illinois v. DiBartolo, 131 F.3d 343, 348 (3rd Cir. 1997) (quoting McKenna v. Ortho Pharm. Corp., 622 F.2d 657, 662 n. 21 (3d Cir. 1980)).

There have been at least four decisions of the New Jersey Supreme Court in which individual supervisors were sued under the LAD for their own discriminatory acts. See Taylor v. Metzger, 706 A.2d 685 (N.J. 1998); Payton v. New Jersey Turnpike Authority, 691 A.2d 321 (N.J. 1997) (employee brought LAD action against her employer and two of her supervisors for sexual harassment); Montells v. Haynes, 627 A.2d 654 (N.J. 1993) (employee brought suit against employer, supervisor, and others asserting claims for personal injuries and sexual harassment under the LAD); Lehman v. Toys `R' Us, Inc., 626 A.2d 445 (N.J. 1993) (former employee brought action against employer, supervisor, and personnel director, alleging hostile work environment sexual harassment in violation of the LAD). Most recently, in Taylor, 706 A.2d 685, the Supreme Court permitted plaintiff, a county sheriff's officer, to sue the county sheriff, her supervisor, for creating a racially hostile work environment based on the sheriff's use of the term "jungle bunny" to describe plaintiff. The central legal issue addressed in Taylor was whether the utterance of a single derogatory racial comment by a supervisor could support a hostile work environment claim under the LAD, but implicit in the decision is the proposition that a supervisor is liable for his or her own discriminatory behavior. This follows from the court's observation that: "[a] supervisor has a unique role in shaping the work environment. Part of a supervisor's duty is to prevent, avoid, and rectify invidious harassment in the workplace." Id. at 691. Although the majority relies on Taylor for its conclusion that a supervisor can be liable as an aider and abettor of discrimination under LAD S 10:5-12(e), nowhere in the Taylor opinion does the court characterize the defendant as an aider and

76

abettor or suggest that any other individual or entity is principally liable. Given this omission, the more reasonable inference to draw from Taylor, as well as the other cases in which supervisors were sued in their individual capacities under the LAD, is that the Supreme Court has endorsed the concept of supervisory liability under LAD S 10:5-12(a).

The decisions of the Appellate Division support an identical conclusion. Muench v. Township of Haddon, 605 A.2d 242 (App. Div. 1992), is particularly instructive. In that case, plaintiff alleged that while working as a probationary dispatcher with the Haddon Township Police Department, she was subjected to a hostile work environment by Joseph Tortoreto, a police officer who had been assigned to train her. Despite plaintiff's complaints to Chief of Police Robert Saunders and Tortoreto's supervisor, Sergeant Walter Aaron, the harassment continued until plaintiff was forced to resign. Plaintiff then brought suit under the LAD against Haddon Township, the Haddon Police Department, Chief Saunders, Sergeant Aaron, and Tortoreto. While the main legal issue in the case was whether plaintiff could maintain a hostile work environment claim in the absence of overt sexual conduct, the court's opinion, which cites, quotes, and discusses S 10:5-12(a), id. at 246, but not the aiding and abetting provision ofS 10:5-12(e), makes plain that supervisors are individually liable under the LAD. As the court stated:

> [T]here is no question that `management-level employees,' Chief Saunders and Sergeant Aaron, had been told by plaintiff of Tortoreto's conduct during plaintiff 's probationary period, and that no corrective steps were taken. Indeed, the trial court found that plaintiff complained to the chief `on two occasions' and the chief did nothing about it. Since the evidence established that supervisory personnel were on notice of the alleged harassment and failed to take corrective steps, defendants, including Haddon Township, are subject to liability under the LAD.

Id. at 249.

Other decisions of the Appellate Division likewise support the notion of individual supervisory liability under LAD

77

S 10:5-12(a). See Maiorino v. Schering-Plough Corp., 695 A.2d 353 (App. Div. 1997) (affirming judgment of compensatory damages in LAD action against plaintiff's former employer and supervisors); Herbert v. Haytaian, 678 A.2d 1183 (App. Div. 1996) (state employee brought LAD claim for sexual harassment against the State of New Jersey and former speaker of the General Assembly); Wilson v. Parisi, 633 A.2d 113 (App. Div. 1993) (reversing grant of summary judgment to defendants in LAD sexual harassment claim brought by high school teacher against high school principal and board of education).

In sum, the above cases provide more than ample evidence that, under LAD S 10:5-12(a), a supervisor may be individually liable for his or her own discriminatory acts. I would therefore hold that on remand, defendants Rifice and Madamba are subject to individual liability under LAD S 10:5-12(a), as well as the aiding and abetting provision of LAD S 10:5-12(e). While I do not reject the possibility that the New Jersey Supreme Court, when squarely presented with this issue in a future case, could decide otherwise, I am convinced that, given our obligation to be sensitive to the doctrinal trends of the state courts in the application of state law, the majority has erred in its prediction on this subject. I therefore dissent.

B.

Finally, I do not agree with the majority's decision to affirm the District Court's grant of summary judgment to defendant Mooney. LAD S 10:5-12(e) provides that it is unlawful "for any person, whether an employer and employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or attempt to do so." This provision could not be more clear in creating liability for any person who aids and abets a violation of the act, whether the individual is a supervisor, a nonsupervisory employee, or even an individual who is not an employee of the entity that is principally liable for discrimination.

Despite the broad scope of the statute, the majority takes the position that a nonsupervisory employee cannot be

78

liable as an aider and abettor for his own affirmative acts of harassment because "such affirmative acts do not substantially assist the employer in its wrong, which is its failure to prevent and redress harassment by individual employees." Maj. Op. at 53 (emphasis in original). This statement is correct as far as it goes, but it overlooks the fact that in many sexual harassment cases, including this one, the employer's wrong is not only its failure to prevent and redress harassment by individual employees. An employer also commits a wrong when its supervisors, whose conduct is generally attributable to an employer because of their position in the organization, engage in harassing behavior. See Ellerth, 118 S. Ct. at 2270; Faragher v. City of Boca Raton, 118 S. Ct. 2275, 2292 (1998). It follows then that anyone who aids and abets harassment perpetrated by a supervisor that is attributable to an employer can themselves be liable under LAD S 10:5-12(e).

Accordingly, while I agree with the majority that, as a nonsupervisory employee, Mooney cannot be said to have aided and abetted the ACPD in failing to respond to his own acts of sexual harassment, that lone observation does not settle the question of Mooney's liability. Contrary to the majority's view, the ACPD is not liable to plaintiff solely for its failure to prevent and remedy a hostile work environment; a reasonable jury could also find that the ACPD is liable to plaintiff on her hostile work environment claim based on Captain Madamba's affirmatively harassing actions, which, given his high rank, are attributable to the ACPD. To the extent then that Mooney aided and abetted Madamba in creating a hostile work environment, Mooney should be subject to liability under LAD S 10:5-12(e). Under our decision in Failla v. City of Passaic, 146 F.3d 149 (3d Cir. 1998), the relevant inquiry is whether Mooney "knowingly [gave] substantial assistance or encouragement" to Madamba's alleged discriminatory actions. Id. at 158. In my view, the evidence in the record is sufficient to support such a finding. For example, plaintiff testified that Mooney, in Madamba's presence, remarked that he had heard that Hurley "liked them hard and stiff." On another occasion, when plaintiff complained to Madamba that someone had stolen her coffee cup, Mooney asked plaintiff whether she

79

wanted to drink out of his jock cup. App. at A2514. Madamba apparently did not rebuke Mooney at all for this behavior. Viewing this evidence in a light most favorable to plaintiff, a reasonable jury could find that Mooney gave substantial assistance or encouragement to Madamba's unlawful acts of harassment. The District Court's grant of summary judgment to Mooney should therefore be reversed.

III.

For the reasons stated above, I would vacate the judgment against the ACPD and remand for a new trial. In addition, while I agree that the case should be retried with respect to defendants Rifice and Madamba, on retrial, I would permit plaintiff to proceed against them under N.J.S.A. S 10:5-12(a) as well as N.J.S.A.S 10:5-12(e). I would also reverse the grant of summary judgment in favor of defendant Mooney. I respectfully dissent.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

80