Thomas P. **KELLY**, Plaintiff,

v.

**RETIREMENT PENSION PLAN FOR CERTAIN HOME OFFICE, MANAGERIAL AND OTHER EMPLOYEES OF PROVIDENT MUTUAL, et al., Defendants.**

No. Civ.A. 01–1789.

United States District Court, E.D. Pennsylvania.

July 11, 2002.

466

Daniel P. McElhatton, Philadelphia, PA, for Plaintiff.

Michael Ossip, Morgan, Lewis & Bockius, LLP, Philadelphia, PA, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KATZ, Senior District Judge.

Plaintiff Thomas Kelly ("Kelly") brings various claims against his former employer, Provident Mutual Life Insurance Company ("Provident") and its retirement plan, the Retirement Pension Plan for Certain Home Office, Managerial and Other Employees of Provident Mutual. Kelly brings a claim for pension credit for certain years of service; a claim for disability retirement benefits; and claims of wrongful termination based on age, disability, common-law retaliation, and breach of implied contract.[1]

After a bench trial, and upon consideration of the parties' pre-trial and post-trial submissions, the court makes the following findings of fact and conclusions of law:

**1.** Specifically, Kelly brings claims of (1) abuse of discretion by his pension plan administrators under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* (ERISA) (Counts One and Two); (2) age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (Count II); (3) disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (Count III); (4) common-law breach of implied contract (Count V); and (5) common-law wrongful discharge in violation of public policy (Count X).

On March 7, 2002, the parties filed a joint stipulation of voluntarily withdrawal with prejudice of the following claims stated in Kelly's First Amended Complaint: (1) breach of express contract (Count IV); (2) breach of covenant of good faith and fair dealing (Count VI); (3) invasion of privacy (Count VII); (4) tortious interference with business relationships (Count VIII); and (5) intentional infliction of emotional distress (Count IX). On March 7, 2002, the parties also filed a notice of voluntary withdrawal of plaintiff's jury demand and thus all remaining claims in this case were tried to the court.

1. Kelly has worked for Provident since 1981.

2. Prior to March 1, 1988, Kelly's employment was governed by various written contracts specifying him as a "Special Agent" or an "Associate Manager."

3. Beginning March 1, 1988 Kelly was employed by Provident under written contract as an Agency Manager. Kelly managed Agency 46, which was located in Mt. Laurel, New Jersey and was established to market and sell Provident insurance products.

4. An Agency Manager is required, *inter alia*, to travel offsite in order to effectively recruit sales agents, to train and supervise field agents and supervisors, and to conduct interviews for regulatory compliance purposes.

5. In March, 1993 Kelly injured his back in a snowmobile accident.

6. From immediately after the accident until October 4, 1993, Kelly was physically absent from work and unable to do any work.

7. During his absence Kelly continued to receive salary payments from Provident.

8. During his absence Kelly began collecting long-term disability benefits under Provident's long-term disability plan administered by UNUM Life Insurance Company of America ("UNUM"). After Kelly returned to work, UNUM discontinued his long-term disability benefits; Kelly eventually sued and the parties settled in 1998, with the result that at least until the date of this trial, Kelly continued to receive partial long-term disability benefits.

9. On October 4, 1993 Kelly began to work again on a very limited part-time basis.

10. By May or June of 1994, he was able to work approximately 30–34 hours a week, a schedule that he maintained until he was terminated in 2000.

11. Kelly's injury precluded him from working the 60 hours per week that an Agency Manager generally works. Before and after returning to work, Kelly discussed his limitations on his working hours with Charles Cronin, former Senior Vice President and a direct supervisor of Kelly's at that time, who told him that such a reduction in hours was not a problem from the company's perspective as long as Kelly managed to do his job.

12. As a result of his injury, Kelly was and remains unable to drive or sit for extended periods of time, and the discomfort, pain and fatigue he suffers is a constant distraction. His injury is a direct cause of his inability to work at the pace and level that he worked at prior to having the accident. Kelly is also limited in his ability to lift heavy objects, ski, scuba dive, hike, golf, and perform general housework.

13. After returning to work until his termination in 2000, Kelly required the assistance of Tom Leonards, a sales manager in his agency, to handle most duties requiring offsite travel, especially recruitment. Kelly also relied on Leonards to assist in other activities such as training and supervision.

14. Because they did not have faith in Leonards' abilities to recruit or perform other managerial duties, Kelly's supervisors at times expressed disapproval of the arrangement to Kelly and to Leonards. In 1997, Leonards' salary was lowered as an incentive either for Leonards to improve his recruiting skills or to encourage the replacement of Leonards with a more skilled recruiter. However, Kelly either would not or could not obtain a different recruiter, and personally made up the difference in Leonards' salary when it was lowered by the company. Kelly's supervisors were aware that Kelly wanted Leonards to continue recruiting and that the arrangement remained ongoing despite

their disapproval. None of Kelly's supervisors forced the arrangement to end, but rather the supervisors tacitly permitted it to continue.

15. Kelly also required a clerical employee to assist him with any heavy physical lifting, and requested and received from Provident a special chair because of his back injuries.

16. In early January, 1999 Kelly was placed on probation. On February 22, 2000 Kelly was terminated as Agency 46 Manager. Kelly continues to work 30–32 hours per week as a sales agent for Provident.

### Benefits Committee Decisions

17. Certain Provident employees are entitled to certain benefits under the Retirement Pension Plan for Certain Home Office, Managerial and Other Employees of Provident Mutual. Kelly introduced into evidence the version of this document that was effective January 1, 1989 (the "Home Office Plan"). Kelly did not assert at trial that that particular document in fact governed the benefits decisions contested in this case, which were made in 2000, but noted that he never received the appropriate documents despite repeated requests made prior to and in connection with this litigation. The Home Office Plan was the product of a merger of two previously separate plans, the previous Retirement Pension Plan for Home Office and Certain Other Employees and the Retirement Pension Plan for Managers in Agency Offices Operated by the Company and Certain Other Employees (the "Managers Plan").

18. The Home Office Plan has designated a Benefits Committee to exercise certain powers and duties under the Plan, including discretionary authority to make factual determinations and to resolve questions or disputes relating to eligibility for benefits.

19. Because the plan vests the plan administrator or fiduciary the discretionary authority to determine eligibility for benefits or to construe the terms of the Plan, plaintiff may recover on his ERISA claims only if the contested Benefits Committee's decisions were an abuse of discretion. See *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Mitchell v. Eastman Kodak*, 113 F.3d 433 (3d Cir.1997). Specifically, Kelly challenges the Benefits Committee's decisions to 1) deny him pension credit for the years 1981 through March 1, 1988 and 2) deny him a disability retirement date of either March, 1993 or February, 2000.

20. In order to find that a plan administrator's determination was an abuse of discretion or arbitrary and capricious, the determination must be found to have been "without reason, unsupported by the evidence or erroneous as a matter of law." *Mitchell*, 113 F.3d at 439. Such a determination must be made on the basis of the evidence that was before the plan administrator when he made the decision being reviewed. *Id.* at 440.

21. There is no dispute that from March 1, 1988 until his termination on February 22, 2000, while Kelly was employed as an Agency Manager, he was covered under the Home Office Plan and amended versions thereof.

22. *However, by letter dated December 29, 2000, the Benefits Committee denied Kelly's claim for credit for the years 1981 through March 1, 1988 for retirement benefit accrual purposes. This denial is the subject matter of Count One in the instant litigation.*

23. When Kelly went back to work after his accident in 1993, he personally believed that his years of employment from 1981 to 1988 qualified for retirement benefit accrual purposes under the Home Office

Plan. Kelly's belief was based on language from the Summary Plan Description issued February 1993 stating that a "full-time managerial employee on a regular annual salary basis" is qualified to participate in the Home Office Plan. However, the Summary Plan Description clearly states that legal rights to benefits were governed not by the summary but by the actual plan document. *See also Gillis v. Hoechst Celanese Corp.,* 4 F.3d 1137, 1142 (3d Cir.1993) (plan document controls where plan document conflicts with Summary Plan Description). Kelly's claim that Provident's Human Resources personnel told him in correspondence and phone calls that he was covered under the Home Office Plan prior to March 1, 1988 is also to no avail, particularly as he was unable to provide any specific details or documentary evidence supporting his testimony on this point.

24. Section 3.2 of the Home Office Plan defines "Covered Employee" as, *inter alia,* "an active, full-time Home Office employee (other than a Regional Pension Manager, a Pension Consultant or a Pension Sales Representative) on a regular annual salary basis as classified on the Home Office payroll by the Home Office Administration," or "an active, full-time Managerial Agency employee on a regular annual salary basis as classified on a Field Clerical payroll by the Company's Agency Division."

25. The term "Home Office employee" is not further defined in the Home Office Plan. The term "Home Office" is used colloquially to refer to certain physical office locations of Provident, neither of which were Kelly's location in Mt. Laurel, New Jersey, but it was established that an employee need not work at either of the Home Office locations to be classified on the Home Office payroll.

26. Although Kelly presented evidence that he was an active, full-time employee with managerial duties on a guaranteed monthly salary from 1981 to 1988, there was no documentary evidence presented as to Kelly's classification at any time during this period on the Home Office or Field Clerical payroll. Kelly admitted that he did not know whether he was classified as a Home Office employee on the payroll. Marie Treftz, who is currently Director of Payroll and Benefits, testified that Kelly would not have been classified on either payroll during that time. Thus, it was not established that Kelly qualified to participate in the Home Office Plan under these definitions of a "Covered Employee."

27. The Home Office Plan further defines "Covered Employee" as, in relevant part, "any person who is employed by the Company to work in an Agency Office operated by the Company as . . . an Associate Manager who is not under a Career Agreement." A "Career Agreement" is "the agreement between a Full–Time Agent and the Company, . . . known as a Special Agent's Career Agreement." A "Full–Time Agent" is, *inter alia,* "an agent who is under a Career Agreement and who is either an Associate Manager or an Assistant Manager."

28. As noted previously, Kelly served from 1981 to 1988 under contracts specifying him as a Special Agent and then as an Associate Manager.

29. These contracts are silent as to which plan, if any, Kelly was covered by while he was party to those agreements. The Special Agent contracts state that nothing in such agreements "shall be construed to create the relation of employer and employee between [plaintiff] and [defendant], except as otherwise provided by law," and that the agreements may be terminated upon written notice. The Associate Manager's agreement states that it may be terminated at any time and that it shall not be construed as a guarantee of employment. These agreements are the

standard agreements used for all of defendant's agents and associate managers. No evidence was presented that any other individual party to a Special Agent or Associate Manager agreement was a participant in the Home Office Plan, and Cronin and Leonards both testified that, while under such contracts themselves, they were not Home Office Plan participants.

30. During the time period in question, a Home Office plan was operative, as was the Managers Plan and a plan commonly referred to as the Agents' Plan. The Managers' Plan was later merged into the Home Office Plan.

31. The Home Office Plan also includes under "Covered Employees" those who are "employed in a classification which is designated by the Board of Directors as covered by the Plan." There was no evidence presented that Kelly was so employed.

■ 32. The administrator's finding that plaintiff was not a Covered Employee from 1981 through March 1, 1988 is supported by the evidence, including the terms of the Home Office Plan and the written employment agreements that clearly designate Kelly as a Special Career Agent and an Associate Manager. That Kelly's job duties were "managerial" in nature prior to 1988, that he personally believed he was covered by the Home Office Plan, and that he received fixed monthly salary payments are irrelevant to whether the Benefits Committee abused its discretion in interpreting the terms of the Home Office Plan. Evidence that some employees classified on the Home Office payroll were not physically located at the two central Home Office locations, and that some employees could be specially designated for participation under the Home Office Plan, also do not provide a basis on which to find that the Benefits Committee's decision was unreasonable since there was no evidence that Kelly in fact fell into either of these categories.

33. *By the above-referenced letter dated December 29, 2000, the Benefits Committee denied Kelly's request for a Disability Retirement Date ("DRD"), as defined under the Home Office Plan, of either 1993 when he was injured in a snowmobile accident (the "1993 DRD Claim"), or February 22, 2000 when he was terminated as Agency Manager (the "2000 DRD Claim"). These denials are the subject matter of Count Two in the instant litigation.*

34. The Home Office Plan defines a DRD as, in relevant part, the date on which a plan participant "(1) is determined by the Committee to have suffered a Total Disability while a Covered Employee, and (2) has a Separation from Service due to such Total Disability."

35. A Separation from Service is an employee's "death, retirement, resignation, discharge or any absence that causes him to cease to be an Employee." An Employee includes "an individual who is Employed" by Provident.

■ 36. It is not disputed that Kelly was a Covered Employee in either 1993 or 2000. In denying the 1993 and 2000 DRD Claims, the Benefits Committee also did not dispute that Kelly had suffered a Total Disability. Rather, the Benefits Committee in its December 29, 2000 letter denied the 1993 DRD claim on the grounds Kelly did not have a Separation from Service in 1993.

37. The evidence presented in support of Kelly's claim that a Separation from Service occurred was that after his accident, he did not do any work for about 8 months and did not report to the office, and that he received medical benefits with respect to his accident under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA).

38. Kelly also testified that he sought and received assurances from Provident's Human Resources personnel that he qualified for a Separation from Service at that time and that his benefits would be based on such a Separation, but he offered no documentation or other corroboration of such assurances either to this court or to the Benefits Committee, although he was represented by counsel before the Benefits Committee with respect to his claims denied on December 29, 2000.

39. Although from March, 1993 until October 4, 1993 Kelly did not do any work and did not report to the office, there is no evidence that the contract under which he had been employed prior to the accident was terminated, rather, he continued to receive a salary, had not been replaced as Agency Manager, and returned to that job when he was able to do so. It was not arbitrary and capricious for the Benefits Committee to determine that these facts did not cause a Separation from Service.

40. Kelly also argues that his receipt of benefits under COBRA establishes that he was terminated. COBRA benefits are triggered by either a reduction in hours or by termination, *see* 26 U.S.C. § 4980B(f)(3); Kelly's argument is that his complete inability to work for 8 months in 1993 was not simply a mere "reduction in hours," and therefore was a "termination" qualifying as a Separation of Service under the Home Office Plan. He offers no legal or other support for this argument, which is not compelling.

41. The Benefits Committee's denial in its December 29, 2000 letter of the 2000 DRD Claim because Kelly's termination was not "due to" his Total Disability was also not an abuse of discretion. As evidenced by the following discussion of the circumstances of Kelly's termination and his claims for wrongful discharge, *see infra*, Kelly's termination was not disability-related, and the court does not find that the Benefits Committee abused its discretion in previously coming to the same conclusion on the record before it.

### Termination

42. After Kelly returned to work in the fall of 1993, he continued to serve as Agency Manager. However, he was placed on probation in early 1999 and terminated in early 2000. Provident claims the decisions were performance-based; Kelly claims they were based on his age, disability, and objections to a certain Provident sales policy.

43. Kelly's supervisors, including Cronin, Cronin's immediate successor, and that person's successor Allen Hansen, were aware of Kelly's limitations at work after his snowmobile accident.

44. Reviews of Kelly's agency's performance in 1995 and 1996 comment on his health and back injuries as relevant to the agency's performance. Specifically, the 1995 second quarter report notes that "Tom Kelly's agency seems to be in neutral gear.... The main problem is Tom's health. It seems to me like he is only about 70–75% of his old self, and I do not foresee any improvement in the near future." The 1995 third quarter report states, "Tom's problems continues [sic] to be his health. I question if Tom has the physical stamina to get the job done. Pending his year end finish, I may need to turn up the heat on Tom!" The 1996 first quarter report notes that "Tom is feeling better (back injury) and works long hours," but the 1996 third quarter report notes that "Tom Kelly's back injuries are still an issue."

45. The absence of further comments as to Kelly's injuries in performance reviews coincides with directions from Provident to Cronin and Hansen not to discuss Kelly's litigation over his disability benefits.

46. However, Cronin and Hansen continued to discuss with Kelly his limitations at work due to his injuries, as well as his need for Leonards to carry out certain duties for which an Agency Manager was normally responsible.

47. The decisions to place Kelly on probation in early 1999 and later to terminate him in early 2000 were made by Cronin, who had been Kelly's direct supervisor and had been promoted to a higher supervisory position by the time of Kelly's probation and termination. As reasons for the probation and termination, Cronin cited the previous six years of performance and problems with two of Kelly's agents in the years just prior to termination. Hansen, who was Kelly's direct supervisor at the time of the probation and termination, agreed with Cronin's decisions, and at trial cited the same performance-related factors.

48. The evidence established that management looked primarily to three factors when gauging the performance of any agency: general profitability, that is, the ability to produce sufficient revenue to cover expenses; the amount of first-year cash commissions, based on total individual products and measured in dollars; and the net growth in the number of agents.

49. Provident set annual quotas for each agency to meet with respect to the latter two criteria. However, testimony and documentary evidence established that normally, only five or six agencies would meet their quotas, and that even in an especially productive year only half of the approximately Provident 20–25 agencies would make quota.

50. First-year commissions and net agent growth were summarized monthly and annually via "Rainbow Reports" issued by Provident. Testimony from Kelly and another agency manager, Frank DePaolo, established that the Rainbow Reports were not entirely accurate, but testimony

from many witnesses also established that such reports were commonly relied upon by management as general indicators of an agency's performance.

51. Provident provided subsidies or relief on a case-by-case basis to some agencies, including loans or loan forgiveness, which assisted in these agencies' success, but did not make their policy of assistance widely known. Kelly's agency did not receive any such assistance.

52. Kelly's agency's performance, as documented by testimony, the Rainbow Reports and by quarterly reports, can be summarized briefly as follows: the agency's strong point was general profitability or ability to produce enough revenue to cover expenses, although profitability dropped significantly in the final years of Kelly's employment. From 1994 to 1999 the agency met its recruitment quota three out of six years, adding a net total of 8 agents over the entire time span. From 1994 to 1998 the agency met or just exceeded its quota for first-year cash commissions for three out of five years, with a noticeable drop in 1998. In 1996, Kelly received a commendation on his performance from Provident's President and Chief Executive Officer. In 1998 he received an industry award for management.

53. The overall rise in production over the six year period was minimal, as was the total increase of eight agents, from ten agents in 1993 to 18 agents in 1999. Hansen explained that 20–25 agents were necessary to create stability and reduce dependence on a few highly profitable agents, whose performance would otherwise control the profitability of the entire agency. The unhealthy reliance of Kelly's agency on a few successful agents, and the related need for heavy recruiting of new profitable agents, was repeatedly noted in Hansen's comments in the quarterly reports for 1998 and 1999. Kelly's own 1999

plan emphasized the negative impact that one agent's poor performance had on the entire agency in 1998. That agent was Stan Lane, who generally accounted for 25–30% of Kelly's agency's business.

54. Although in 1998 Kelly's agency exceeded its recruitment quota, in commissions were at 51% of quota, and profitability had sunk to negative levels. Part of the problem was that even though there were several new recruits, those recruits were not generating much revenue. Kelly's 1998 performance was also due to the large drop-off in Lane's commissions; morale problems due to Lane's personal discontent with Kelly, which were exacerbated by Kelly's unawareness of the problem for several months; certain company-wide problems, such as the late introduction of products promised but not delivered by Provident; Kelly's own stress related to and his agents' awareness of his litigation over his disability benefits; and heart problems of Kelly's unrelated to his back injury, which are not the basis for any of Kelly's claims in this litigation.

55. Lane was difficult to work with, but he was a highly profitable agent and consequently exerted strong influence among upper-tier management and other highly profitable agents. He initially discussed his discontent with Kelly directly with the President of Provident. Lane threatened to leave Provident unless he secured a transfer from Kelly's agency, but under company policy Kelly's permission was required, which Kelly would not give. To assuage Lane, Cronin proposed an arrangement effectuating a transfer while permitting Kelly to retain some credit and profits from Lane's business. Kelly rejected the proposal. Lane eventually moved his operations out of Kelly's location in Mt. Laurel, New Jersey, while formally remaining an agent of Kelly's.

56. After a particularly bad year for Kelly's agency in 1998, Cronin placed Kelly on probation by virtue of a letter dated February 2, 1999 from Hansen, which stated that if specific goals were not met by June 30, 1999, Kelly's office would "be considered for consolidation and the distinct possibility exists that your position as an agency manager will be eliminated." The February 2, 1999 letter also stated that Kelly was obligated to meet his annual 1999 quotas, in addition to these mid-year goals.

57. Kelly met the goals established for June 30, 1999, in large part because one of his agents closed one highly profitable deal. Provident management sent him two short notes congratulating him on his performance in summer and fall of 1999. However, like almost every other agency that year, Kelly did not meet his year-end quotas. Reasons for Kelly's inability to meet quotas that year included certain company-wide issues, such the fact that sales agents were required only to produce $4,000.00 in commissions, which caused a significant drop in revenue as they had previously been required to produce $20,000.00 in commissions; structural changes in the company as a whole, which caused discontent among some managers and agents; the fact that his new recruits were again not producing much revenue; and the late availability of certain promised products, which was in part due to the strict New Jersey regulatory process.

58. Provident terminated Kelly's employment on February 22, 2000.

■ 59. *Kelly's claim of wrongful termination on the basis of disability is the subject of Count III.* The central factual and legal disputes are whether Kelly [qualifies for protection under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and if so, whether he] was terminated legally because of poor performance as claimed by the defendant, or

**474**

illegally because of his disability as prohibited by the ADA.[2]

60. An ADA *prima facie* case requires that (1) plaintiff is disabled within the meaning of the ADA; (2) he is a "qualified individual with a disability," that is, qualified to perform the essential functions of the job with or without reasonable accommodation by the employer; and (3) he has suffered an adverse employment action. *See Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir.2000); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (setting forth framework); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (same); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (same).

61. As to whether Kelly is in fact disabled, he describes his limitations as not being able to drive or sit for extended periods of time; feeling constant discomfort, leading to pain and fatigue and a need to remain prone once the pain sets in until the following morning; and an inability to lift heavy objects, ski, scuba dive, hike, golf, and perform general housework. Similar limitations have not been found to qualify as a substantial limitation on major life activities under the ADA. *See, e.g., Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180 (3d Cir.1999) (ankle injury not a disability although causing slight limp, need for 10–minute breaks while walking or standing, and occasional use of cane or crutch); *Weber v. Strippit, Inc.*, 186 F.3d 907 (8th Cir.1999) (shoveling snow, gardening, playing tennis, fishing, and hiking are not major life activities); *Buskirk v. Apollo Metals*, 116 F.Supp.2d 591 (E.D.Pa. 2000) (inability to engage in various athletics, driving and performing household chores, and moderate restrictions on lifting, sitting and standing, do not qualify individual for ADA protection).

62. The court further notes that the recent case of *Toyota Motor Mfg., Ky., Inc. v. Ella Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), casts doubt on whether working constitutes a major life activity. However, in the absence of clear guidance, the court considers Kelly's claim that he was limited in the life activity of working. Such a claim requires that the employee must be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *See Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 783 (3d Cir.1998) (citing 29 C.F.R. § 1630.2(j)(3)(i)).

**2.** Prior to submitting his post-trial proposed findings of fact and conclusions of law, Kelly had not pursued a claim that Provident failed to fulfill its obligations with respect to reasonable accommodations under the ADA. Rather, in his pre-trial submissions and at trial, Kelly steadfastly insisted that his agency's performance was not in any way affected by his physical condition, and that the agency's performance after his accident was just as good or better than that of other agencies. While Kelly asserts for the first time in his post-trial proposed findings of fact and conclusions of law that Provident refused to engage in the requisite "interactive process" as to accommodation, *see* 29 C.F.R. pt. 1630, App.

§ 1630, testimony established that Kelly's supervisors refused only to discuss Kelly's ongoing disability litigation against Provident, but continued to discuss with him his work limitations caused by his injuries. Furthermore, to the extent that Kelly's injuries necessitated that Tom Leonards perform recruiting and other manager functions, Kelly's supervisors discouraged the arrangement but ultimately permitted it to continue, and in addition an individual who requires the hiring of another to perform essential functions of a job is not a "qualified individual" as required under the ADA. *See* 29 C.F.R. pt. 1630, App. § 1630.2(*o*); *see also Robertson v. Neuromedical Center*, 161 F.3d 292 (5th Cir.1998).

63. There was no evidence that Kelly meets this test. Although the quarterly reports indicated a link between Kelly's health and his inability to perform as Manager, they do not support a finding that Kelly was precluded from a broad class of jobs. As part of the severance package by Provident, he was offered a specially-created position with the company, and he currently still works as a sales agent. Although he cannot work a 60–hour week as normally required to fulfill an Agency Manager's duties, Cronin told Kelly that the actual number of hours did not matter as long as the work was done, and provided an example of another manager who effectively performed his job duties despite taking off two months each year. Furthermore, although Kelly cannot even work a 40–hour week, which is a standard requirement of full-time employment, a reduction in hours is insufficient to show a substantial limitation or a preclusion from a broad class of jobs. *See Shaw v. Greenwich Anesthesiology Assocs., P.C.,* 137 F.Supp.2d 48, 56 (D.Conn.2001) ("mere reduction in hours need not be a substantial limitation on the ability to work"); *Newton v. Signature Group,* No. 99 CV 4772, 2000 WL 1016945, at *9 (N.D.Ill. July 20, 2000) (evidence that plaintiff could only work 30 hours per week insufficient to show preclusion from broad class of jobs).

■ 64. Kelly also pursues his claim under 42 U.S.C. § 1202(2), which provides that an individual is disabled within the meaning of the ADA if he is "regarded as disabled." For Kelly to be "disabled" under the "regarded as" portion of the ADA's definition of disability, he must demonstrate that he has a nonlimiting impairment that his employer mistakenly believed limits major life activities. *See Tice v. Centre Area Transp. Authority,* 247 F.3d 506, 515 (3d Cir.2001). His employer must have perceived that his impairment substantially limited him in a major life activity, and not just with respect to one particular job. *See Murphy v. United Parcel Service, Inc.,* 527 U.S. 516, 522, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999) ("[T]o be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job."); *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (job applicants failed to state claim in alleging only that airline regarded their poor vision as precluding them from holding positions as global pilots, not from working entirely, and other positions were available utilizing their skills); *Tice,* 247 F.3d at 514 (no evidence that employer believed that employee was unable to work in broad class of jobs by requiring medical examination in relation to specific job of bus driving).

■ 65. Although Provident knew that Kelly applied and sued for disability benefits and could not perform certain Agency Manager job functions, there was no evidence presented that Provident regarded Kelly as substantially limited in a major life activity, or as precluded from any job other than Agency Manager. Provident offered Kelly a severance package that permitted him to continue working in a certain capacity, and he currently works as a sales agent. Thus, Kelly is not protected under the ADA as disabled or as regarded as disabled, and his ADA claim must fail.

66. Even assuming that a *prima facie* case was made, Kelly's claim still fails. Once a *prima facie* case is established, the burden of production[3] shifts to the em-

---

**3.** While an ADA claim may be either a mixed motive or a pretext claim, *see Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.,* 60 F.3d 153 (3d Cir.1995), the court considers Kelly's claim as a pretext claim as there is not sufficiently "direct" evidence to warrant consideration under a mixed-motive framework. *See Price Waterhouse v. Hopkins,* 490 U.S.

ployer who must articulate a legitimate, non-discriminatory reason for the adverse employment action at issue. *See Shaner*, 204 F.3d at 500. After the employer satisfies this burden of production, to succeed plaintiff must convince the factfinder that the employer's proffered reasons were really pretextual and that discrimination was the real reason for the employment action. *Id.* at 501. The plaintiff bears the burden of proving discrimination by a preponderance of the evidence, that is, he must: (1) rebut the employer's proffered reason; or (2) produce such other evidence that proves that discriminatory animus was the determinative cause of the adverse employment action. *Id.* "To discredit the employer's proffered reason, [ ] the plaintiff cannot simply show that the employer's decision was wrong or mistaken. . . . Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (citations omitted).

■ 67. Kelly established that his failure to meet some of his quotas in 1998 and 1999 alone was not a credible reason for termination; however, Cronin, Hansen and the documentary evidence established that the overall condition of Kelly's agency from 1994 to 1999 was a credible reason for termination, particularly as to Kelly's inability to grow the agency to a stable size.

68. Although the 1995 and 1996 quarterly reports certainly raise concerns in their emphasis on the relationship between Kelly's health and his poor performance, and although it could be inferred that Kel-

ly's health in fact significantly affected his overall performance, including his inability to effectively recruit, Kelly simply does not claim that his injuries actually caused poor performance in recruiting or otherwise. Rather, he merely claims that his performance was objectively not bad enough in comparison with other agencies to warrant termination, and that therefore bias against him on account of his physical condition must have been the real reason for termination.

69. The court finds that Kelly's agency's performance was poor in comparison to most other agencies, that his supervisors considered it as such, and that he was treated similarly to at least three other poorly performing managers who were not disabled but who were also terminated around the same time that Kelly was. The court further finds that Provident placed Kelly on probation and terminated him because of his performance and also because of personal animosity between Kelly and Lane, Cronin, and Hansen, but not because of any animosity or discrimination towards Kelly on the basis of his injuries. Cronin's expressed displeasure at being deposed in connection with Kelly's disability benefits did not play a part in the decisions, although general dislike for Kelly did play a role, as did negative feelings arising from the Lane affair, from Kelly's insistence on retaining Leonards instead of seeking another recruiter, and from an unrelated dispute between Cronin's wife and Kelly's wife's over an attempt to tape record Kelly's speech at an industry gathering. Furthermore, not only performance but also favoritism and cronyism played a role in the decisions to support other agencies with subsidies or relief and to fail to provide Kelly's agency with similar assistance, and in the more favorable treatment of other poorly performing man-

228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989);     *see also infra*, n. 4.

agers who were not terminated. However, personal animosity, favoritism and cronyism are not illegitimate criteria for adverse employment actions.

70. *As to Kelly's claim of wrongful termination on the basis of age, which is the subject of Count II,* the central factual and legal disputes are whether Kelly was replaced by someone sufficiently younger to raise an inference of discrimination, and if so, whether Kelly produced sufficient evidence to rebut the defendant's claim that he was terminated because of poor performance and not because of his age.

71. The plaintiff bears the burden of proving intentional employment discrimination by a preponderance of the evidence. *See Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207; *McDonnell Douglas,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407. The parties apparently agree that plaintiff must first establish a *prima facie* case of age discrimination by demonstrating that he: (1) was a member of a protected class, *i.e.,* that he was over 40, (2) is qualified for the position, (3) suffered an adverse employment decision, and (4) was ultimately replaced by a person sufficiently younger to permit an inference of age discrimination. *Duffy v. Paper Magic Group, Inc.,* 265 F.3d 163, 167 (3d Cir.2001).

72. When Kelly was terminated, he was 53 years old, and his operations were merged into that of another Provident agency, co-managed by Tom Schirmer and Marc Smith. Schirmer was 52 years old at the time of Kelly's termination, was senior managing partner and received a 60% share in income; Smith was 40 years old, had joined in 1997 or 1998 as junior managing partner, and received a 40% share in income. Smith was being groomed for eventual successorship to Schirmer.

73. Schirmer and Smith each took over certain elements of Kelly's position. For three to six months after Kelly's termination, Schirmer spent nearly every day in Kelly's former office, transitioning the agents and support staff to the new management. He remains the senior manager and is responsible for overall operations, back office support, finances, regulatory compliance, working with senior agents, and management of most associates. On the other hand, Smith specifically oversees the marketing and recruiting efforts of the agency. Tom Leonards, as Kelly's primary recruiter, reported primarily to Smith after Kelly was terminated.

74. To the extent that Kelly was replaced by Schirmer, this replacement does not support an age discrimination claim. *See Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1087 (3d Cir.1992) (plaintiff who was replaced by an individual one year younger did not establish a *prima facie* case of age discrimination under the ADEA), *abrogated on other grounds by Griffiths v. CIGNA Corp.,* 988 F.2d 457, 472 (3d Cir.1993) *as recognized in Abrams v. Lightolier, Inc.,* 841 F.Supp. 584, 589 (D.N.J.1994); *Fakete v. Aetna, Inc.,* 152 F.Supp.2d 722, 735 (E.D.Pa.2001) (plaintiff who was replaced by an individual three years younger than himself did not establish prima case of age discrimination under the ADEA); *Lazzaro v. Franklin Mint Co.,* 840 F.Supp. 339, 343 (E.D.Pa.1993) (plaintiff who was replaced by an individual one year younger did not establish a *prima facie* case of age discrimination under the ADEA).

75. However, to the extent that Smith—who is over ten years younger than Kelly—replaced Kelly, an inference of age discrimination arises. Other evidence potentially giving rise to an inference of age discrimination is the testimony of Cronin and Schirmer, who attested that Provident's pension plan provides strong

incentives for retirement.[4] Cronin also emphasized that as a supervisor, he paid particular attention to managers who were nearing or over 55 years old, knowing that they might shortly retire, and directed considerable effort and resources towards ensuring that such managers either remained sufficiently productive or that younger successors were groomed and put into place. Throughout his testimony, Cronin conveyed a heightened awareness of whether a particular manager had reached 55 years old. Cronin, who is currently 58, also testified that he was personally concerned about the company's trend toward hiring and promoting younger executives, having lost a promotion himself to a younger competitor.

■■■■■■■ 76. Whether or not Smith's partial replacement of Kelly and/or Provident's policy with respect to managers over 55 constitutes "direct" evidence of age discrimination affects the burden each party bears at trial.[5] However, even assum-

---

4. The terms of the plan itself and any incentives contained therein are not specifically contested in the instant lawsuit. *Compare Sempier v. Johnson & Higgins*, 45 F.3d 724, 732 (3d Cir.1995) (use of early retirement program to dismiss redundant or underperforming employees is not illegal, but program designed to force older employees to leave or face significant pressure to resign or retire might itself create inference of age discrimination) *with Gray*, 957 F.2d at 1081 ("Of course, the mere offer of an early retirement program does not support an inference of discrimination.") (citations, punctuation omitted).

5. In a true mixed motive case involving "direct evidence" of discriminatory animus, as defined by *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), a plaintiff offers evidence that age was "a motivating factor" and that decisionmakers placed substantial negative reliance on plaintiff's age in making their decision to terminate him. *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 (3d Cir.1995); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 n. 5 (3d Cir.1998). Once plaintiff has met his burden, the burden then shifts entirely to the defendant to show that age, although it was a motivating factor, did not ultimately make a difference to the decision. *See id.; Miller v. CIGNA*, 47 F.3d 586, 597 n. 9 (3d Cir.1995).

"Direct" evidence warranting consideration under the mixed-motive framework is evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude. *Id.* (quoting *Miller*, 47 F.3d at 594). Circumstantial evidence may suffice. *See Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 513 (3d Cir. 1997). "What is required is ... direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Starceski*, 54 F.3d at 1096 (citations omitted); *see also id.* at 1096–97 (inference of bias was "direct and inescapable" where superior instructed transfer of work from older to younger employees and managers construed instructions as order to set up older employees for termination), *vacated on other grounds*, 510 U.S. 802, 114 S.Ct. 42, 126 L.Ed.2d 13 (1993); *Hook v. Ernst & Young*, 28 F.3d 366 (3d Cir.1994) (sexual advances and remarks unrelated to decisionmaking process did not constitute direct evidence); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1186–87 (2d Cir.1992) (mixed motive instruction warranted on evidence that defendant stated that sales force was "getting too old," that plaintiff was replaced by younger employee, and that plaintiff was excluded from employee group called "Young Tigers"); *Ostrowski v. Atlantic Mutual Insurance Companies*, 968 F.2d 171, 182 (2d Cir. 1992) (evidence that decisionmakers stated that "there is no way [a 60 year old employee] can contribute," that two ADEA-protected employees should have remained in retirement and that plaintiff should be fired because he hired older employees, constituted "direct" evidence). Such "direct" evidence is "so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case to shift the burden of production." *Id.*

In contrast, in a pretext case where such direct evidence is lacking, plaintiff must show that age had "a determinative influence" in the employment decision. *See Watson v. Southeastern Pennsylvania Transportation Authority*, 207 F.3d 207, 223 (3d Cir.2000); *Mil-*

ing there is direct evidence warranting considering of this case under a mixed-motive framework, which is more demanding of the defendant, and assuming that plaintiff has shown age to be a motivating factor in Provident's decision as required by that mixed motive framework, *see supra* at n. 4, the court finds for Provident on Kelly's age discrimination claim because Provident has shown that age did not ultimately make a difference to the decision. *See Walden v. Georgia–Pacific Corp.,* 126 F.3d 506, 513 (3d Cir.1997).

77. The evidence as to the treatment of managers who were similarly situated in terms of performance showed that Kelly's age ultimately did not make a difference in his termination. Unrebutted evidence established that other managers who performed poorly during the same time period were also placed on probation and terminated, including some significantly younger than Kelly. Another manager who did not grow his agency from 1993 to 1999, like Kelly, was not put on probation or terminated for an arbitrary or hardly credible reason—that is, because Cronin ostensibly did not have time—but as there was no evidence as to the age of that manager, it was not probative of age discrimination. Cronin and Hansen also proffered credible explanations as to why other agencies with similar net growth statistics as Kelly's were not treated similarly, such as that net growth was less significant for those agencies that had already established a critical size and stability. In addition, the fact that Provident gave some agencies subsidies or relief, but not Kelly's agency, was credibly explained in terms of the overall revenue-generating capacity of each agency; furthermore, as another manager close

to Kelly's age was given subsidies, there was no evidence that Kelly did not receive subsidies on the basis of his age. Also, as noted previously, personal animosity and dislikes unrelated to Kelly's age played a role in the company's treatment of Kelly. Finally, although the agreement to merge the agencies may well have been initiated or made prior to Kelly's actual termination, despite testimony to the contrary, the court does not find this persuasive or relevant as to Kelly's claim of age discrimination.

78. *As to Kelly's claim of wrongful termination on the basis of retaliation, which is the subject of Count X,* the central factual and legal disputes are whether Kelly's complaints as to certain practices of the defendant were an illegal grounds for termination, and if so, whether Kelly was terminated because of those complaints or because of poor performance.

79. Kelly objected to his superiors within Provident about its marketing policy with respect to a particular rider. Provident's policy was that agents could offer the noncommissionable rider only when faced with direct competition by another agent; Kelly believed that the policy might result in a breach of fiduciary duty and a violation of the duty of fair dealing set forth by the Securities and Exchange Commission, and raised this concern to both Cronin and Hansen.

80. While Kelly does not contest the legality of the rider, and while the rider is widely used throughout the industry, evidence established that the concern raised by Kelly is a common concern throughout the industry.

*ler,* 47 F.3d at 597. Then, the burden of production but not of persuasion shifts to the defendant to offer nondiscriminatory reasons. *See id.* The plaintiff must then prove that the proffered explanation is pretextual; if it so

proves, the factfinder may, but is not required, to find for plaintiff. *See id.* Thus, under a pretext framework, the burden on plaintiff is higher than under a mixed-motive framework.

81. Employers remain free to terminate at-will employees like Kelly for a good reason, bad reason or no reason at all. *Clark v. Modern Group Ltd.,* 9 F.3d 321, 327 (3d Cir.1993).. In *Clark,* the Third Circuit held that an at-will employee cannot recover for a common-law retaliatory discharge resulting from "a disagreement with management about the legality of a proposed course of action unless the action ... actually violates the law." *Id.* at 328. It is not sufficient that the employee merely believed the practice to be illegal. *See id.* at 328–332.

82. The evidence established that there are serious and widespread concerns about the illegality of the practice to which Kelly objected. Such concerns do not establish that the practice is in fact illegal, however. Nor was there other evidence persuasively presented to this effect. Thus, under *Clark* Kelly cannot recover for retaliatory discharge on the basis of his objection to the policy.

83. *As to Kelly's claim of breach of implied contract, which is the subject of Count V,* Kelly entered into a Manager's Agreement with Provident which expressly states that the Agreement may be terminated by either party "for any reason ... with or without cause." However, Kelly claims that an implied contract arose from Hansen's probationary letter to Kelly dated February 2, 1999, which stated that "[Y]ou must be at 40% of your life quota, or $220,000, by June 30th. Your net growth must stand at plus 2 as of June 30th. I would also hope to see a nuetral [sic] BMF, or at minimum, a significant reduction in the negative carry-forward. If you are unable to meet these objectives, it is likely that your office will be considered for consolidation and the distinct possibility exists that your position as an agency manager will be eliminated.... Obviously, you will also be held accountable for your annual 1999 quotas."

84. Kelly met his June 30, 1999 goals. He testified that he believed that this would guarantee him treatment equal to that afforded other managers, not that this accomplishment would guarantee him employment in the following year.

85. To overcome the express at-will Manager's contract there must be "an express contract between the parties or an implied in-fact contract plus additional consideration passing from the employee to the employer from which the court can infer the parties intended to overcome the at-will presumption." *Permenter v. Crown Cork & Seal Co.,* 38 F.Supp.2d 372, 377 (E.D.Pa.1999) (citation, punctuation omitted).

86. The probationary letter does not overcome the express at-will employment contract Kelly entered into with Provident. The fact that Provident management congratulated Kelly twice on his performance in 1999 in the months prior to terminating him also does not create a contract for continued employment. Neither does the long-term nature of his employment, nor any expectations arising therefrom. *See Buckwalter v. ICI Explosives USA, Inc.,* No. 96–CV–4795, 1998 WL 54355, at *9 (E.D.Pa. Jan. 1, 1998) (rejecting plaintiff's argument that working adequately for four years under the assumption that he would be promoted constituted additional consideration overcoming at-will contract).

87. Even assuming that the February 2, 1999 letter constituted an express or implied contract of guaranteed employment, the letter expressly stipulated that Kelly was expected not only to meet his June 30th goals but also his year end 1999 quotas, a condition which Kelly did not meet.

## JUDGMENT

**AND NOW,** this 11th day of July, 2002, judgment is entered on the claims in **FA-**

**VOR** of the defendants, Provident Mutual Life Insurance Company and the Retirement Pension Plan for Certain Home Office, Managerial and Other Employees of Provident Mutual, and **AGAINST** the plaintiff, Thomas Kelly.